894 F.2d 965
 30 Fed. R. Evid. Serv. 244
 UNITED STATES of America, Appellee,
v.
Earl D. DREW, a/k/a Derrick/Dereck Drew, Appellant.
UNITED STATES of America, Appellee,
v.
Dennis Edward DREW, Appellant.
UNITED STATES of America, Appellee,
v.
Hampton David STEWART, Jr., a/k/a Snookie, Appellant.
 Nos. 88-2661, 88-2662 and 88-2668.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1989.
Decided Jan. 17, 1990.
 
 John R. Cullom, Kansas City, Mo., for appellants.
 Thomas M. Larson, Kansas City, Mo., for appellee.
 Before LAY, Chief Judge, BOWMAN, Circuit Judge, and LARSON, District Judge.*
 BOWMAN, Circuit Judge.
 
 
 1
 This is an appeal by defendants found guilty of various drug charges in yet another drug house case from Kansas City. The case began with an indictment in February 1988 charging Dennis Drew with two counts of distribution of cocaine. Shortly after this indictment was filed, Frank Biondo informed the Federal Bureau of Investigation that Dennis Drew had attempted to hire Biondo to murder Carolyn Tanner, whose testimony before the grand jury had led to the February indictment.
 
 
 2
 In his subsequent meetings with Drew, Biondo, who had turned government informant, carried a hidden tape-recorder, which was monitored by the police. During these meetings, Drew and Biondo continued their discussions regarding the murder contract and Biondo purchased narcotics from Drew. These conversations, as well as other information provided by Biondo and Tanner, implicated three others in a conspiracy to distribute cocaine and provided the probable cause for a warrant to search the residence shared by the four apparent conspirators. The search turned up marijuana, cocaine, various paraphernalia commonly used in the illegal sale of narcotics, a substantial cache of guns, and a large amount of money.
 
 
 3
 Based on this additional evidence, the grand jury returned a superseding indictment against Dennis Drew, Earl Drew, Hampton Stewart, and Henry Tatum. Charges against Henry Tatum were dropped because he could not be located at the time of trial. After a trial by jury, all the remaining defendants were found guilty of conspiracy to distribute cocaine and cocaine base, 21 U.S.C. Sec. 846 (1982); Earl and Dennis Drew were convicted of distribution of cocaine, 21 U.S.C. Sec. 841(a)(1) (1982); Dennis Drew alone was found guilty of attempting to kill Carolyn Tanner to prevent her from testifying, 18 U.S.C. Sec. 1512(a)(1)(A) (Supp. V 1987); and only Earl Drew was convicted of use of firearms in relation to a drug trafficking offense, 18 U.S.C. Sec. 924(c) (Supp. V 1987). On appeal, the defendants raise a total of ten issues. None is meritorious, and we affirm.
 
 I.
 
 4
 We turn first to the issues raised by Earl Drew.
 
 A.
 
 5
 Earl Drew appeals the District Court's[1] denial of his motion to sever his trial from those of his two co-defendants. To prevail, Drew must show clear prejudice and abuse of discretion. United States v. Martin, 866 F.2d 972, 979 (8th Cir.1989). No such showing has been made. Drew and the other defendants were charged with having engaged in a criminal conspiracy. Rarely, if ever, will it be improper for co-conspirators to be tried together, id., and it clearly was not improper here.
 
 
 6
 We reject Drew's claim that the out-of-court tape recorded statements of his co-defendants who did not testify at trial violated his rights under the confrontation clause of the Sixth Amendment of the Constitution. These recordings were admissible as statements of co-conspirators under Rule 801(d)(2)(E) of the Federal Rules of Evidence, and the requirements for admission pursuant to Rule 801(d)(2)(E) are coterminous with the constitutional requirements of the confrontation clause. Bourjaily v. United States, 483 U.S. 171, 182, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987); see also 2 W. LaFave & J. Israel, Criminal Procedure Sec. 17.2 at 364 (1984).
 
 
 7
 While Drew acknowledges the applicability of Rule 801(d)(2)(E), he argues that "the cumulative prejudice" of the out-of-court statements and statements regarding the prior criminal history of one of his co-defendants militated for severance. But the statements of his co-conspirators would have been admissible even if he had been tried separately. The reference to the prior criminal history of one of appellant's co-defendants was directed only to that co-defendant and the trial judge gave a limiting instruction. The District Court did not err in denying Drew's motion for severance from his co-defendants.
 
 B.
 
 8
 Earl Drew attacks his conviction under 18 U.S.C. Sec. 924(c) for unlawfully "us[ing]" or "carr[ying]" a firearm during the commission of a felony on the ground that the evidence was insufficient to submit that charge to the jury. He argues that because he did not discharge or explicitly threaten to discharge a gun, he cannot be charged with use of a firearm during the commission of a felony. Appellant faces a steep road to reversal on these grounds: we must construe the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and the government is entitled to "the benefit of all inferences that reasonably may be drawn from the evidence." United States v. Ellison, 793 F.2d 942, 949 (8th Cir.), cert. denied, 479 U.S. 937, 107 S.Ct. 415, 93 L.Ed.2d 366 (1986).
 
 
 9
 In this case, the felony to which Drew's firearms charge attaches was not a single discrete event, but the continuous operation of a drug house. The jury found appellant guilty of both conspiracy to distribute cocaine and cocaine base and distribution of cocaine. Several undercover drug purchases occurred at the house shared by the conspirators; evidence was presented that cocaine powder was converted to cocaine base or "crack cocaine" on the premises; and a search of the house turned up divers paraphernalia associated with the sale of drugs such as a scale, a pager, a beeper, and variously sized glassine bags, in addition to an inventory of illegal drugs.
 
 
 10
 It was in this house that a .357 magnum revolver as well as a .44 magnum revolver were found. The .357 revolver and ammunition for the .44 revolver were found in Earl Drew's bedroom. Tr. Vol. 1 at 8, 32. Government witness Frank Biondo testified that Drew had bartered cocaine for the .357 magnum and carried the gun to the door when greeting late-night callers. Tr. Vol. 2 at 17, 18.
 
 
 11
 Noting the need of drug dealers for guns to protect their operations, this Court has made clear on several occasions that the mere presence and ready availability of a firearm at a house where drugs are dealt constitutes the "use" of a gun during a narcotics offense. See, e.g., United States v. Brett, 872 F.2d 1365, 1370-71 (8th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). In the present case, the jury had more than sufficient evidence to find that Earl Drew participated in the operation of a drug house, that a gun was present at the drug house and in Drew's possession and control, and that Drew "use[d]" a firearm during the commission of a drug trafficking crime.
 
 C.
 
 12
 Earl Drew raises two separate issues concerning the government's closing argument. We review the trial court's rulings on objections to statements made in closing argument under an abuse of discretion standard. United States v. Flynn, 852 F.2d 1045, 1055 (8th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 511, 102 L.Ed.2d 546 (1988).
 
 
 13
 First, appellant again invokes his theory on the meaning of "use" under the firearm statute in arguing that the government misstated the law in closing argument thereby denying appellant his due process rights under the Fifth Amendment of the Constitution.[2] Because we find Drew's interpretation of the law as requiring an actual or threatened discharge of a firearm contrary to any plausible reading of Sec. 924,[3] we obviously find no error in the government's failure to present appellant's version of the law to the jury during closing argument.
 
 
 14
 Appellant's second complaint with the closing argument is that government counsel misstated the law by describing "beyond a reasonable doubt" as equivalent to being "sure" or "certain." The relevant definitions given by Webster's Third New International Dictionary (unabridged) (1981), for "certain" are: "not to be doubted as a fact: INDISPUTABLE ... given to or marked by complete assurance and conviction, lack of doubt ... through or as if through infallible knowledge." Id. at 367. And those for "sure" are: "assured in mind: having no doubt ... marked by ... feelings of confident certainty and conviction esp. of the rightness of one's judgment ... objectively certain: admitting of no doubt ... marked by unquestionable fact, verity, or substantiation." Id. at 2299.
 
 
 15
 To the extent that the words "sure" and "certain" differ in meaning from "beyond a reasonable doubt," it is not the defendant who should be protesting: the definitions of "sure" and "certain" appear to encompass even doubts that do not merit the qualifier "reasonable." Although we think prosecutors would be well advised to avoid trying to explain to the jury the meaning of "beyond a reasonable doubt" (this is a function properly performed only by the trial judge), the error here favored the defendants and was harmless beyond a reasonable doubt. We therefore decline to reverse on this ground.
 
 D.
 
 16
 Earl Drew next contends that evidence of his drug dealing prior to the period covered in the indictment was improperly admitted. The admissibility of prior bad acts evidence is governed by Rule 404(b) of the Federal Rules of Evidence.
 
 
 17
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 18
 The decision to admit evidence of prior bad acts is within the sound discretion of the trial judge, see, e.g., United States v. Gustafson, 728 F.2d 1078, 1083 (8th Cir.), cert. denied, 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984), subject only to an abuse of discretion standard of review by this Court. United States v. Bowman, 798 F.2d 333, 337 (8th Cir.1986), cert. denied, 479 U.S. 1043, 107 S.Ct. 906, 93 L.Ed.2d 856 (1987). Indeed, "reversal is only commanded when 'it is clear that the questioned evidence has no bearing upon any of the issues involved.' " United States v. Thompson, 503 F.2d 1096, 1098 (8th Cir.1974) (quoting Wakaksan v. United States, 367 F.2d 639, 645 (8th Cir.1966), cert. denied, 386 U.S. 994, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967)). We find no reason to reverse the District Court's ruling.
 
 
 19
 There is no question that the evidence of appellant's prior narcotics transactions has some bearing on his guilt in the charged narcotics offenses as showing, among other things, opportunity, intent, preparation, and plan. That this evidence is relevant to a material issue raised is not even challenged by appellant.
 
 
 20
 While conceding that evidence of his previous narcotics transactions was relevant on a material issue, appellant argues that three other requirements for admission were not met. Appellant first claims that his previous operation of a drug house was not sufficiently close in time to the charged offense. See United States v. Marshall, 683 F.2d 1212, 1215 (8th Cir.1982). Government witness Frank Biondo testified that Drew had operated a drug house as far back as 1985 and that at some point in 1986 the operation moved to a different house. His testimony did not suggest, however, that there had been any significant interruption in Drew's operation of drug houses.
 
 
 21
 Although proximity in time combined with similarity in type of crime virtually guarantees admittance of prior bad acts evidence, see, e.g., United States v. Anderson, 879 F.2d 369, 378 (8th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989), these are only factors tending to negate the possibility that the evidence was improperly introduced to "prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). The ultimate question always remains whether the evidence "is admissible to prove any relevant issue other than the character of the defendant or his propensity toward criminal activity." United States v. McDaniel, 773 F.2d 242, 247 (8th Cir.1985).
 
 
 22
 We have frequently sustained the admission of prior bad acts evidence without so much as a passing mention of closeness in time and similarity of the prior act to the charged offense when it was relevant to an issue other than the character of the defendant, such as motive, intent, or absence of mistake. See United States v. Felix, 867 F.2d 1068, 1072 (8th Cir.1989); United States v. Pierce, 792 F.2d 740, 743 (8th Cir.1986). In the case of "signature" crimes, or "other crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused," C. McCormick, McCormick on Evidence Sec. 190(3), at 559 (E. Cleary 3d ed. 1984), the time factor is obviously much less important than in the typical 404(b) case. Evidence offered to prove motive by showing the existence of a larger plan, on the other hand, could properly include evidence of a wholly different prior bad act committed in connection with the charged offense. Id. See, e.g., Grandison v. State, 305 Md. 685, 735-36, 506 A.2d 580, 605, cert. denied, 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986) (indictment in federal narcotics case admissible in state prosecution for hiring an assassin to kill witness in federal case). Proximity in time and similarity of conduct are only factors that may be considered by the trial judge in deciding whether to admit evidence of prior bad acts; they are not requirements for admission.
 
 
 23
 Moreover, whether under the rubric of "intent," "knowledge," or "common plan or scheme," we have repeatedly upheld the admission of prior drug transactions in cases charging narcotics violations. See, e.g., United States v. Haynes, 881 F.2d 586, 590 (8th Cir.1989); United States v. Maichle, 861 F.2d 178, 180 (8th Cir.1988); United States v. Norton, 846 F.2d 521, 524 (8th Cir.1988). We may add Drew's case to the list without delving into the precise timing of his prior drug dealings which, in any event, apparently continued straight up to, indeed through, the time period of the charged conspiracy.
 
 
 24
 Drew next argues that the evidence of his prior drug dealing did not satisfy the "clear and convincing" standard, which until recently was the requirement for such evidence in this Circuit. More than one month before Drew went to trial, however, the Supreme Court rejected the "clear and convincing" standard, holding that evidence of prior bad acts may be admitted "if there is sufficient evidence to support a finding by the jury that the defendant committed the [prior acts]." Huddleston v. United States, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988); see also id. at 685 n. 2, 108 S.Ct. at 1499 n. 2 (distinguishing requirements for admission of such evidence among the circuits). The government's evidence of Drew's prior drug transactions consisted of the testimony of Frank Biondo, one of the government's principal witnesses throughout the trial. We cannot say the District Court abused its discretion in admitting this evidence under either the "clear and convincing" standard or the Huddleston standard.
 
 
 25
 Finally, Drew invokes the residual complaint available under Rule 403 of the Federal Rules of Evidence that the "probative value [of the evidence was] substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. We are satisfied, however, that the District Court did not abuse its discretion in declining to exclude the challenged evidence under Rule 403. The evidence had considerable probative value and any prejudice resulting from its admission was not unfair.
 
 E.
 
 26
 Earl Drew's final argument on appeal is that the court's refusal to give the jury any of appellant's three requested instructions on witness credibility at the conclusion of the trial constitutes reversible error. We note at the outset that, beyond the requirement that the charges correctly state the law, instructions to the jury are wholly within the province of the trial judge because the jurors' understanding of the instructions "is certainly more evident in the living scene than in a cold record." United States v. Bayer, 331 U.S. 532, 537, 67 S.Ct. 1394, 1396, 91 L.Ed. 1654 (1947).
 
 The District Court instructed the jury:
 
 27
 You have heard evidence that witnesses Frank Biando [sic] and Carolyn Tanner, a/k/a Carolyn Porter, have received a promise from the government that they will not be prosecuted for their prior drug-related activities and that their testimony will not be used against them. You may give their testimony such weight as you think it deserves. Whether or not their testimony may have been influenced by the government's promise is for you to determine. You should, however, consider their testimony with greater caution and care than that of an ordinary witness.
 
 
 28
 Jury Instruction 6.
 
 
 29
 You have heard evidence that witnesses Frank Biando [sic] and Carolyn Tanner, a/k/a Carolyn Porter, have an arrangement with the government under which they receive expense payments from the government for providing information to the government. The government may present the testimony of such persons, and you may give their testimony such weight as you think it deserves. Whether or not their information or testimony may have been influenced by receiving expense payments is for you to determine. You should, however, consider their testimony with greater caution and care than that of an ordinary witness.
 
 
 30
 Jury Instruction 7.
 
 
 31
 These instructions were more than merely correct--all that is necessary to avoid reversal. United States v. Ridinger, 805 F.2d 818, 821 (8th Cir.1986). In fact, the instructions fully and precisely informed the jury of its role and alerted the jury to the potential pitfalls of an informer's testimony.
 
 
 32
 Finally, Drew asserts that "[t]he simple but very important law that jurors are free to believe none of a witness' [sic] testimony cannot be found in the instructions given by the district court." Appellant's Brief at 41. The preliminary jury instructions, however, covered this point virtually verbatim: "You are free to believe everything a witness says or only part of it or none of it." Appellee's Addendum, Partial Transcript at 5. That we find this claim meritless does not distinguish it from Drew's other arguments on appeal; it is its patent frivolity only that merits distinction.
 
 II.
 
 33
 We next turn to the appeal of Dennis Drew, who raises various challenges to his convictions and contests the sentence imposed by the District Court.
 
 A.
 
 34
 Drew's first argument is that the District Court erred in admitting evidence seized pursuant to a search warrant that he claims was issued without a showing of probable cause. "[T]he traditional standard for review of an issuing magistrate's probable-cause determination has been that so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (quoting Jones v. United States, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960), overruled on other grounds, United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980)). The magistrate's decision to issue a warrant is entitled to great deference. United States v. Arenal, 768 F.2d 263, 266 (8th Cir.1985). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review." Gates, 462 U.S. at 236, 103 S.Ct. at 2331.
 
 
 35
 In this case, the affidavit in support of the warrant application described two electronically monitored and recorded purchases of cocaine from Dennis Drew at the house the officers sought authorization to search. The house also had been identified as a drug house by a confidential informant and had been the object of a prior investigation leading to an earlier indictment. Drew's astonishing claim that this affidavit contains no "facts [that] could justify the magistrate in a finding of probable cause" is based on complaints such as that the affidavit failed to indicate "what [the policeman] was doing" while monitoring the purchase, that the affidavit does not indicate that the policeman actually saw Drew hand cocaine to the wired informant, and that the magistrate did not himself listen to the tape recorded purchase of cocaine.[4] Appellant's Brief at 14, 16, 17.
 
 
 36
 It is apparent to us that the information contained in the affidavit, if presented as evidence at trial, would be sufficient for a jury to convict Drew of trafficking in cocaine. Much less than that is required for a showing of probable cause to support the issuance of a search warrant. We therefore reject Drew's attack on the magistrate's probable cause determination.
 
 B.
 
 37
 Drew argues that the District Court committed reversible error by denying his request for a mistrial when a portion of a tape-recorded conversation played for the jury referred to his prior incarceration. The statements forming the basis of Drew's demand for a mistrial were:
 
 
 38
 Source [Carolyn Tanner]: Uh, how long was you in jail last time, Emani [Dennis Drew]?
 
 
 39
 Dennis Drew: Five years.
 
 
 40
 Transcript of F.B.I. tape (Trial Exhibit TR-3) (revised) at 17. This portion of the tape-recorded conversation had not been transcribed for the jury. As soon as it was played to the jury, the case agent stopped the tape and, in his attempt to resume at a part of the tape that had been transcribed for the jury, inadvertently replayed this portion of the tape. Drew's motion for a mistrial was made after the jury was dismissed for the day. The next day the District Court denied that motion and gave this curative instruction:Now, ladies and gentlemen of the jury, in the tape that we heard, the last thing yesterday evening, anything that was heard over that tape that wasn't in the transcript should be disregarded by the jury and not considered by you in your deciding this case.
 
 
 41
 Tr. Vol. 2-A at 8.
 
 
 42
 Viewed in the context of the entire trial, the revelation of Drew's prior incarceration was clearly harmless error. This portion of the tape was not intentionally interjected into the evidence at trial, the trial judge gave an appropriate curative instruction,[5] the prosecutor did not advert to the prior conviction at any point in the course of the trial, and, finally, the evidence of Drew's guilt was overwhelming. We obviously do not mean to suggest that each of these factors is necessary for a finding of harmless error. In fact, we have sustained convictions involving far more significant improprieties and fewer mitigating factors than we find here. See, e.g., United States v. Sopczak, 742 F.2d 1119, 1122 (8th Cir.1984). The presence of the foregoing factors, however, allows us to reject Drew's argument without hesitation.
 
 C.
 
 43
 Drew next attacks his sentence, raising three separate issues. First, Drew maintains that only the quantity of drugs he actually sold should be considered in calculating his offense level under the Sentencing Guidelines. In calculating Drew's sentence under the Guidelines, the District Court arrived at an offense level based on the entire quantity of drugs and firearms found at the drug house--341 grams of cocaine and two handguns--rather than the 66.1 grams of cocaine sold by Drew himself. Drew does not make a factual challenge to the quantity of drugs and firearms discovered at the drug house, but argues that as a legal matter his sentence should take into account only those drugs sold by him.
 
 
 44
 The Guidelines Manual quite clearly belies Drew's argument by explicitly providing for inclusion of the entire quantity of drugs and firearms involved in the conspiracy of which he was convicted.
 
 
 45
 Section 1B1.3(a)(1) of the Manual provides:
 
 
 46
 a. Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
 
 
 47
 (1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;
 
 The commentary to this section states:
 
 48
 Conduct "for which the defendant would be otherwise accountable," as used in subsection (a)(1), includes conduct that the defendant counseled, commanded, induced, procured, or willfully caused. (Cf. 18 U.S.C. Sec. 2.) If the conviction is for conspiracy, it includes conduct in furtherance of the conspiracy that was known to or was reasonably foreseeable by the defendant.
 
 
 49
 United States Sentencing Commission, Guidelines Manual, Sec. 1B1.3, comment. (n. 1) & App. C, amend. 78 (Nov. 1989) (emphasis added). The entire quantity of drugs as well as the firearms, which the District Court found were used in furtherance of the conspiracy, thus were properly included in calculating Drew's offense level.
 
 
 50
 Drew's final two arguments attacking his sentence can be considered together. He argues that his offense level should have been reduced by two points on account of his "acceptance of responsibility" and that the District Court's upward departure from the Sentencing Guidelines was unwarranted. We reject both of these arguments for the same reason: both these rulings of the District Court properly were grounded on Drew's attempt to murder one of the government's witnesses.
 
 
 51
 Although the connection between Drew's conviction for attempting to kill Carolyn Tanner in order to prevent her from testifying, and our refusal to describe as "without foundation"[6] the District Court's denial of a sentencing discount for appellant's "acceptance of responsibility," cannot fairly be described as nuanced, we will elaborate. The commentary to section 3E1.1 of the Guidelines, applicable at the time of sentencing, states: "An adjustment under this section is not warranted where a defendant perjures himself, suborns perjury, or otherwise obstructs the trial or the administration of justice (see Sec. 3C1.1), regardless of other factors." U.S.S.G. Sec. 3E1.1, comment. (n. 4) & App. C, amend. 258. Appellant does not contest the enhancement of his sentence under section 3C1.1. The District Court's denial of an adjustment in Drew's sentence for an "acceptance of responsibility" on his part was not only not an abuse of discretion but was perfectly correct.
 
 
 52
 Appellant's attempt to murder Tanner also provides ample justification for the District Court's upward departure from the Guidelines. Section 5K2.0 of the Guidelines Manual states:
 
 
 53
 Under 18 U.S.C. Sec. 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." ... The controlling decision as to whether and to what extent departure is warranted can only be made by the court at the time of sentencing.... Any case may involve factors in addition to those identified that have not been given adequate consideration by the Commission. Presence of any such factor may warrant departure from the guidelines, under some circumstances, in the discretion of the sentencing judge.
 
 
 54
 We will review the District Court's decision to depart upward only for an abuse of discretion.
 
 
 55
 The trial judge acted well within his discretion in finding that the Guidelines do not adequately take into account an attempt to murder a government witness under the section concerning willful obstruction of proceedings. That section, 3C1.1, permits the addition of two offense levels for such conduct as "destroying or concealing material evidence" and "testifying untruthfully." U.S.S.G. Sec. 3C1.1, comment. (n. 1(a), (c)). The paradigmatic conduct in the Guidelines commentary most similar to Drew's attempt to murder witness Tanner refers only to "threatening, intimidating, or otherwise unlawfully attempting to influence a ... witness." Id., comment. (n. 1(d)). An attempt to murder a witness unquestionably falls within the category of "factors ... that have not been given adequate consideration by the Commission" in formulating the enhancement for obstruction of proceedings. Drew's attack against his sentence thus must fail.
 
 III.
 
 56
 Hampton Stewart appeals his conviction for conspiracy to distribute cocaine and cocaine base under 21 U.S.C. Sec. 846 on the ground that the evidence presented to the jury was insufficient to permit a guilty verdict. We review the sufficiency of the evidence in a light most favorable to the government. See IB, supra.
 
 
 57
 Stewart lived and worked at the drug house. Government witness Frank Biondo testified that "I purchased [cocaine] from just about everybody that was ever in that house." Tr. Vol. 2 at 6. This remark was preceded by Biondo's referring to the date on which Stewart moved into the house, and in the testimony immediately following this statement, Biondo describes Stewart's principal role in the operation as cooking the cocaine from powder to base cocaine.
 
 
 58
 Stewart argues that his presence in the drug house was due only to his "need[ing] shelter from the weather in March, 1988," and that "[h]e simply needed a place to live for a few days." Appellant's Brief at 25-26. Biondo testified, however, that Stewart "move[d] in there to stay" in the fall of 1987. Tr. Vol. 2 at 9; accord id. at 4, 6.
 
 
 59
 Biondo's testimony during direct examination included the following:
 
 
 60
 Q (by the government). Okay. Now I want to show you what's an exhibit that's in evidence as Plaintiff's Exhibit S-3 and do you recognize this?
 
 
 61
 A. It looks just like the scale that was ... [in t]he drug room.
 
 
 62
 * * * * * *
 
 
 63
 Q. And besides using it yourself did you see other persons use it?
 
 
 64
 A. Oh yeah.... Derrick [Earl Drew] used to use it, Emonte [Dennis Drew] used to use it, Snookie [Stewart] used to use it and Gup used to use it too.
 
 
 65
 Q. Okay. What would they use it for?
 
 
 66
 A. They used it to weigh the drugs on.
 
 
 67
 Tr. Vol. 2 at 10-11.
 
 
 68
 Q. All right. What about Snookie, did you ever see him personally with a gun?
 
 
 69
 A. Yeah, I think he opened the door a few times with it.
 
 
 70
 Q. With a gun in his hand?
 
 
 71
 A. In his hand, yes. Not pointing at you, you know, just to the side.
 
 
 72
 Tr. Vol. 2 at 18.
 
 
 73
 Q. Now, did you ever observe Mr. Stewart, Snookie, doing anying [sic] in connection with cocaine?
 
 
 74
 A. Snookie was the only one that knew how to cook the cocaine up in the bottles.
 
 
 75
 Q. And what was the purpose of that?
 
 
 76
 A. To take the powder cocaine, you cook it up--I believe he was doing a gram at a time and you cut it into pieces and put it in little bags and sell them as what they call rock cocaine or crack.
 
 
 77
 Tr. Vol. 2 at 6.
 
 
 78
 Q. Okay. Now, the conversation came about he likes to cook Rice Krispies. What does that mean?
 
 
 79
 A. Snookie was cooking the cocaine and they joke around and just call it Rice Krispies I guess, at least Gup did.
 
 
 80
 Q. And did you see him doing that? Did you see Snookie doing that cooking?
 
 
 81
 A. Yes, I did.
 
 
 82
 Tr. Vol. 2 at 41.
 
 
 83
 Q. Mr. Biondo, on your visits to 1522 East 51st or 1520 East 51st in Kansas City, during March of 1988, at least, did you ever see Snookie, Mr. Stewart, working with cocaine in the kitchen?
 
 
 84
 A. Yeah, he was the one that cooked the cocaine for the kids.
 
 
 85
 Q. So there were times when you--were there times when you saw him doing that when you had a recorder on your person?
 
 
 86
 A. Yes, at least once.
 
 
 87
 Tr. Vol. 2 at 64.
 
 
 88
 This, together with the other evidence of the defendants' activities at the drug house, entitled the jury to find Stewart guilty of conspiracy to distribute cocaine.
 
 IV.
 
 89
 The convictions are affirmed. Only Dennis Drew appealed his sentence. That sentence is affirmed.
 
 
 
 *
 The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The Honorable Scott O. Wright, Chief Judge, United States District Court for the Western District of Missouri
 
 
 [2]
 In our opinion, the challenged portion of the government's closing argument, cut short by appellant's objection at trial, was rather generous in its inclusion of appellant's theory of the gun's purpose:
 And you need not find that that was the only possible use for the gun. I mean, you might use it to protect yourself, you might use it for target shooting, you might use it to do whatever you want to do for sport, for show, whatever, but if one day a week or one night a week he used that gun to protect those drugs, to protect his money or to protect himself when he came to the door early in the morning, and you've heard testimony that that's what it was about--.
 Tr. Vol. 4 at 11.
 
 
 [3]
 We note that appellant's objection at trial, that "[a]nyone in this country can protect themselves with a [hand]gun in the morning when someone comes to the door at 4:00 [a.m.]," Tr. Vol. 4 at 11-12, happens to be an incorrect statement of the law in several localities in this country including the seat of federal government. See D.C.Code Ann. Sec. 6-2312(4) (1989 Repl.Vol.)
 
 
 [4]
 These complaints, we should note, constitute Drew's most serious objections. Others, such as that "[t]here is no indication as to how the agent 'contemporaneously monitored' this event," Appellant's Brief at 16, are directly contradicted by the language of the affidavit
 
 
 [5]
 Drew complains that the trial judge did not specifically refer to the statements that he was instructing the jurors to ignore. While our conclusion would be no different if the judge had informed the jury yet a third time of Drew's prior conviction, we note that the instruction he gave, omitting reference to the previous incarceration, was more advantageous to Drew
 6 U.S.S.G. Sec. 3E1.1, comment. (n. 5).