UNITED STATES of America, Appellee,

v.

Michael WINT, Appellant.

UNITED STATES of America, Appellee,

v.

Charlie MURDOCK, Appellant.

UNITED STATES of America, Appellee,

v.

Stanley Arthur BRYAN, Appellant.

Nos. 91–3831, 91–3832 and 91–3855.

United States Court of Appeals,
Eighth Circuit.

Submitted June 8, 1992.

Decided Aug. 28, 1992.

Steven A. Pihlaja, Minneapolis, Minn., argued for appellant Michael Wint.

Linda M. Ojala, Minneapolis, Minn., argued for appellant Charlie Murdock.

Michael J. Majewski, St. Paul, Minn., for appellant Stanley Arthur Bryan.

Carol A. Needles, Minneapolis, Minn., argued (Thomas B. Heffelfinger, Carol A. Needles and Nathan Radcliff, on brief), for appellee.

Before WOLLMAN, Circuit Judge, BRIGHT and ROSS, Senior Circuit Judges.

WOLLMAN, Circuit Judge.

Charlie Murdock and Michael Wint appeal from their convictions and sentences[1] for conspiracy to distribute cocaine, 21 U.S.C. §§ 841(a)(1), 846, aiding and abetting the distribution of cocaine, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2, and threatening a witness with the intent to influence his testimony, 18 U.S.C. §§ 2, 1512(b)(1). Stanley Bryan appeals from his convictions for conspiracy and aiding and abetting. We affirm.

## I.

The convictions of Murdock, Wint and Bryan centered around a drug transaction that occurred at a Minneapolis–St. Paul area hotel. Bryan, testifying for the government without any promises or grant of immunity, described the events preceding that transaction. While in a Chicago nightclub, Bryan related to a woman how acquaintances of his in the Twin Cities had asked him where they could obtain cocaine. The woman in turn told Bryan about various "Jamaican posses," the "businesses" they were involved in, and how Bryan could "make some money" if he was interested. Bryan knew that the posses had a reputation for drug-dealing and violence, and he told the woman that he was not interested.

On four different occasions soon thereafter Bryan was approached by men, some of them armed, who tried to convince him to join one of the posses. Bryan stated that the men threatened him and his wife, told him they were watching him, and on

---

**1.** The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

one occasion displayed a picture of him and his wife with an "X" marked on his wife's image. Murdock and Wint were each present at one of these encounters, but Bryan did not state that either one made such threats. On the first two occasions Bryan refused to join, but on the third he told the posse representatives that he would think about it.

After this third encounter Bryan visited a local police station but was told that the police could do nothing without some corroboration of Bryan's story. Neither Bryan nor his wife suffered any repercussions after his visit to the police. Both travelled to and from work without incident; posse members did not escort them.

Upon being contacted a fourth time, Bryan agreed to work for the posse, whereupon posse members instructed him to contact one of his acquaintances in the Twin Cities. Bryan thereafter cooperated in arranging and delivering cocaine to the acquaintances, "Bill" and "Robin," on four separate occasions. On the first of these occasions Bryan was accompanied by a man, on the second by a woman, and on the third by Murdock. Bryan saw no evidence of any weapons during the four trips to sell drugs. The fourth transaction is the one for which Wint, Murdock and Bryan were arrested.

Murdock, Wint and Bryan drove from Chicago to conduct the cocaine transaction in the Twin Cities. When they arrived Bryan called "Johnnie Johnson," who directed them to the Sheraton Airport Hotel. Johnson met them in the hotel parking lot and provided them with the cocaine. Wint put the cocaine into Bryan's briefcase and retained control of it until just prior to the drug transaction.

Bryan told Johnson that he (Bryan) wanted Johnson and Bill to meet so that they could conclude their drug transaction without Bryan's having to be further involved. Johnson replied that he did not want to meet Bill and that if Bryan refused to go through with the deal "all it would take . . . was a phone call to Chicago, and they could kill [Bryan's] wife." *United States v. Stanley Arthur Bryan, Charlie Murdock & Michael Wint,* No. 4–91–71, Trial Transcript at 367 (D.Minn. Aug. 27, 1991) ("Trans.").

Bryan and Wint entered the hotel at about 5:00 a.m. on April 25, 1991, and requested two rooms. Bryan filled out the registration cards for both rooms, one card in his own name and the other, per Wint's instructions, in the name of "Johnnie Johnson." Bryan showed Wint the card filled out in the name of Johnson. Murdock later checked out of the two rooms, signing the name "Johnnie Johnson" to both check-out sheets.

Wint kept the cocaine with him in the room registered to Johnson, while Bryan stayed in the other room with Murdock.[2] Later that morning, Bryan called Bill, who was a confidential informant, to arrange the cocaine transaction. Bill arrived and told Bryan that he would return later that morning with a friend who would participate in the deal. While waiting, Bryan went alone to a nearby Fina service station to get cigarettes.

When Bryan returned he met Murdock outside the hotel. Murdock informed Bryan that the contact person for the deal—Bill—was in the lobby. Murdock proceeded toward the van, carrying the briefcase. Still later, at about the time of the transaction, another police officer conducting surveillance observed Wint walking about the hotel parking lot in a "nondirect" or "circular" manner and "looking around quite a bit."[3]

Bryan found Bill, and the pair went to meet Bill's "friend," who was in fact an undercover police officer. Per instructions from Murdock and Wint, Bryan gave the undercover officer a cocaine sample that he had received from Wint. The undercover

---

**2.** A government witness explained that, when conducting a drug transaction, sellers often obtain two rooms. The drugs are kept in one while the other serves as a place to meet the purchaser.

**3.** A special agent with the Minnesota Bureau of Criminal Apprehension testified that walking about in this way was consistent with countersurveillance activity.

officer approved of the sample, and Bryan told him to drive to the back of the hotel and wait while Bryan retrieved the cocaine.

Bryan and Bill returned to the van, obtained the drugs from Murdock, walked back to the undercover officer's car and sold him 718.9 grams of cocaine. Bryan was arrested shortly after the transaction.

Murdock was arrested in the van. Officers found in his possession an Illinois driver's license in the name of Charlie Murdock and a "Video City" rental card in the name of "Kadane Curtis." Wint was arrested outside the hotel. In his possession officers found receipts for the two hotel rooms.

Police officers questioned Bryan immediately after his arrest, and he confessed to them that Murdock, Wint, and he were all involved in the cocaine transaction at the Sheraton Hotel. At his first court appearance, however, Bryan testified that Murdock and Wint were not guilty. Bryan also prepared a note, addressed to his attorney, in which he stated that he wished to plead guilty to one count of the indictment and that Murdock and Wint had no idea that the purpose of the trip to the Twin Cities was to sell drugs. At trial, Bryan explained why he changed his story.

> The first time after we been arrested they been pressuring me to plead[ ] guilty to accept the charge, the fall for all the charges, and pressuring me into pleading guilty. And they threatened to kill me and my family if I didn't. So they told me I should tell the judge that they didn't have nothing to do with it, and I told him, and they said I should [tell] my attorney.
>
> .  .  .  .  .
>
> I just did it ... because I didn't want my family to be harmed by these guys. I was scared for my wife's li[fe], because I was in custody, I wasn't there to help her in any way whatsoever.

Trans. at 189–90. Bryan also stated that both Murdock and Wint threatened to kill Bryan, his wife, his family and "all the people that [were] close to [him]." Trans. at 193. An inmate at the facility where Murdock, Wint and Bryan were held corroborated Bryan's story. He stated that he overheard Murdock and Wint threatening that Bryan's life would be in danger unless he took "the whole rap for something that they done, all three of 'em." Trans. at 256.

A superseding indictment charged Murdock and Wint on three counts and Bryan on two counts. All three were charged with conspiracy to distribute cocaine, Count I, and aiding and abetting in the distribution of cocaine, Count II. Murdock and Wint were also charged with threatening to kill Bryan, Count III.

At the trial the prosecution introduced evidence in addition to that described above. Specifically, the government introduced evidence that Wint had been arrested in New York in 1986 while in possession of fifty-four vials of crack cocaine. The officer who had apprehended Wint in New York testified that, based on his experience, fifty-four vials of crack is an amount commensurate with distribution, not personal use. Bryan also testified that, in addition to his real name, he knew Murdock by the names Kadane Curtis and Bigga. Finally, a district manager for the Social Security Administration testified that the social security number on Murdock's driver's license had been assigned to George Cole Williams, not Murdock.

The three defendants were tried together and a jury returned verdicts of guilty on all charges. The court sentenced Murdock and Wint to 144 months' imprisonment, an upward departure from the seventy-eight to ninety-seven month range called for by the guidelines. The court granted Bryan a downward departure and sentenced him to thirty months. All three defendants appeal from their convictions. In addition, Murdock and Wint appeal from their sentences.

## II.

■ Murdock and Wint both argue that the district court erred in refusing to sever their trials from Bryan's. We have stated that "[r]arely, if ever, will it be improper for co-conspirators to be tried together." *United States v. Drew*, 894 F.2d 965, 968 (8th Cir.), *cert. denied*, 494 U.S.

1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990). The decision whether to grant severance is committed to the discretion of the district court, *United States v. Adkins*, 842 F.2d 210, 212 (8th Cir.1988), and

> we will not reverse its decision absent a showing of clear prejudice which indicates an abuse of discretion. To show such prejudice, a defendant must establish something more than the mere fact that his chances for acquittal would have been better had he been tried separately. He must affirmatively demonstrate that the joint trial prejudiced his right to a fair trial.

*United States v. O'Connell*, 841 F.2d 1408, 1432 (8th Cir.1988) (citations omitted), *cert. denied*, 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989).

■ Wint argues that the usual presumption, that co-conspirators should be tried together, should not apply because the superseding indictment added Count III, threatening a witness. This, Wint maintains, transformed Bryan from a co-conspirator into an opponent. Moreover, Wint argues, trying him with Bryan prejudiced his right to a fair trial because Bryan's defense consisted of attacking Wint and Murdock. In addition, Wint contends, Bryan's duress defense was irrelevant to the charges against Wint and would have been excluded had Wint been tried separately. Murdock adds that denial of severance prejudiced his right to a fair trial because his and Bryan's defenses were irreconcilable. Bryan's defense, Murdock insists, required that he show that Murdock was involved in the drug deal, whereas Murdock's defense required that he show that he had no knowledge of any drug transaction. *See United States v. Jones*, 880 F.2d 55, 63 (8th Cir.1989) (defenses irreconcilable if they so conflict "that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other") (citation omitted).

The district court did not abuse its discretion in refusing to sever the trials. Regardless of the addition of Count III, all three defendants were charged as co-conspirators. Joint trial is generally proper in such a case. *United States v. Payne*, 923 F.2d 595, 597 (8th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 2830, 115 L.Ed.2d 1000 (1991). Wint's right to a fair trial was not prejudiced by the admission of evidence regarding threats against Bryan after the defendants were arrested because, had Wint been tried separately, these threats would have been admissible against Wint as evidence of intent. *See United States v. Carmichael*, 685 F.2d 903, 910 (4th Cir. 1982) (evidence of attempts to conceal substantive offenses would be admissible to show criminal intent), *cert. denied*, 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983). Moreover, Bryan did not testify that either Wint or Murdock personally threatened him (Bryan) prior to their arrest. Other posse members were identified as the source of the threats.

We also conclude that Murdock's and Bryan's defenses were not irreconcilable. One could logically accept Bryan's duress defense on the ground that other posse members threatened him while accepting Murdock's defense that he knew nothing of the drug transaction. *See, e.g., United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir.) (upholding refusal to sever where jury could believe both defendant's coercion defense and co-defendant's defense), *cert. denied*, — U.S. —, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990); *United States v. Swingler*, 758 F.2d 477, 494–96 (10th Cir.1985) (same).

### III.

Wint challenges the admission of evidence that he had previously been arrested for a drug offense; Murdock challenges the admission of evidence that he used other names and a false social security number.

■ Federal Rule of Evidence 404(b) permits the admission of evidence of other crimes or bad acts to prove, among other things, intent, motive, or knowledge. *United States v. Crook*, 936 F.2d 1012, 1015 (8th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 974, 117 L.Ed.2d 138 (1992).

[E]vidence of other crimes or acts is admissible if 1) the evidence is relevant to a

material issue; 2) the prior bad acts are similar in kind and reasonably close in time to the crime charged; 3) there is sufficient evidence to support a finding by the jury that the defendant committed the prior acts; and 4) the potential prejudice of the evidence does not substantially outweigh its probative value.

*United States v. Burk,* 912 F.2d 225, 228 (8th Cir.1990) (citations omitted). We will reverse the district court's exercise of discretion in admitting such evidence "only if the defendant shows that the proof clearly ha[d] no bearing on any relevant issue." *Crook,* 936 F.2d at 1015.

■ Wint contends that evidence of his arrest in New York on a drug offense should not have been admitted because it does not meet the second and fourth parts of the test set out above. He contends that the New York arrest does not satisfy part two because it occurred five years prior to the instant offense, the amount of cocaine was much smaller, and he was not charged with having an accomplice.

■ We note that proximity in time and similarity of conduct "are only factors tending to negate the possibility that the evidence was improperly introduced." *Drew,* 894 F.2d at 970. "The ultimate question always remains whether the evidence is admissible to prove any relevant issue other than the character of the defendant or his propensity toward criminal activity." *Id.* (citation omitted). In any event, evidence of an offense committed within the previous five years is reasonably close in time. *See United States v. Burkett,* 821 F.2d 1306, 1309–10 (8th Cir.1987) (seven years between offenses). In addition, the prior and instant offenses are similar in kind in that both involved distributable amounts of cocaine.

Wint also asserts that the probative value of the evidence was substantially outweighed by its potential prejudice. We note that Wint's defense to the instant charges was essentially that he did not know the purpose of the trip to the Twin Cities. Evidence of Wint's prior arrest while in possession of distribution amounts of cocaine rebutted this claim because "tes-

timony of prior drug transactions is admissible to prove that a defendant acted knowingly and intentionally." *United States v. Maichle,* 861 F.2d 178, 180 (8th Cir.1988). *See also United States v. Galyen,* 798 F.2d 331, 333 (8th Cir.1986) ("evidence of ... prior offers to sell drugs is relevant to intent to distribute").

■ Murdock, on the other hand, challenges the admission of evidence that he used other names and a false social security number. He asserts that the evidence is not relevant to any material issue, and thus fails the first part of the test, because there was no evidence that he used other names or the false number in connection with the charged offenses.

We disagree. There was evidence that Murdock signed a false name, Johnnie Johnson, when checking out of the hotel. This fact, in combination with Murdock's possession of a rental card identifying him as "Kadane Curtis" and a driver's license bearing a false social security number, supports the inference that Murdock wished to conceal his true identity. His desire to conceal his identity, in turn, indicates that his involvement in the cocaine transaction was knowing and intentional. *See United States v. Kloock,* 652 F.2d 492, 495 (5th Cir. Unit A 1981) (possession of false identification while in possession of drugs supports inference that drug possession was intentional). Thus, the evidence was relevant to a material issue.

Finally, Murdock contends that the evidence fails the fourth part of the test because it served no purpose other than to make him appear to the jury to be a "suspicious character." As discussed immediately above, however, the evidence had probative value. In our judgment, that probative value was not substantially outweighed by the potential for prejudice.

We note that the testimony concerning Wint's and Murdock's prior acts did not describe those acts in detail. In addition, the district court gave the jury cautionary instructions, both at the time the evidence was admitted and at the conclusion of the trial, regarding the limited purpose for

which it could consider the evidence of Wint's prior acts.[4] These instructions guarded further against potential prejudice and confirm our conclusion that the probative value of the evidence was not substantially outweighed by the potential for prejudice. *See Burk*, 912 F.2d at 229 (brief depiction of prior bad act and limiting instructions safeguarded against unfair prejudice).

## IV.

■ Wint and Bryan challenge the sufficiency of the evidence to support their convictions.

> When reviewing for sufficiency, we examine the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences. We reverse only if we conclude that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements.

*United States v. Ivey*, 915 F.2d 380, 383 (8th Cir.1990) (citations omitted).

■ We consider first Wint's challenge to his conviction for conspiracy to distribute cocaine.

> To prevail on a charge of conspiracy, the government must prove that the defendants agreed to commit an illegal act. The agreement need not be formal; a tacit understanding will suffice. Moreover, the government may prove the agreement wholly by circumstantial evidence or by inference from the actions of the parties.

*United States v. Sparks*, 949 F.2d 1023, 1027 (8th Cir.1991) (citations omitted), *cert. denied*, —— U.S. ——, 112 S.Ct. 1987, 118 L.Ed.2d 584 (1992). Wint argues that no rational fact-finder could have found that an agreement existed because Wint was never observed in possession of either the money or the drugs, he did not sign the

hotel register, and he insisted to the police that he knew nothing of the drugs.

■ Without recounting the evidence in detail, we note the following significant evidence. Bryan testified that all three defendants drove from Chicago to the Twin Cities for one purpose: to sell cocaine. Wint took the cocaine supplied by Johnson, placed it in Bryan's briefcase, and maintained control of the briefcase until just prior to the sale. He saw (and apparently approved of) the hotel registration cards that Bryan filled out in the name of "Johnnie Johnson." Finally, Wint's behavior in the parking lot supports the inference that he was watching for police officers. We conclude that, on the basis of this evidence, a rational fact-finder need not entertain a reasonable doubt concerning whether Wint entered an agreement to distribute cocaine.[5]

Bryan asserts that the evidence was not sufficient to support his convictions because the prosecution did not prove that he voluntarily entered an agreement or otherwise cooperated. Instead, he maintains, he was coerced by the posse's threats. *See United States v. May*, 727 F.2d 764, 765 (8th Cir.1984) (setting forth elements of coercion defense). Moreover, he argues, he did attempt to avoid selling drugs inasmuch as he resisted the posse's initial overtures and on one occasion contacted the police.

■ We accept for purposes of this opinion that the threats against Bryan were of immediate harm and that Bryan had "a well-grounded apprehension of death or serious bodily injury" if he refused to sell drugs. *May*, 727 F.2d at 765. If Bryan had a reasonable, legal alternative to committing the crime, however, one which would have avoided the threatened harm, his coercion defense cannot absolve him of culpability. *Id.; United States v. Uthe*, 686 F.2d 636, 637 (8th Cir.1982). Bryan did have such an alternative. Just prior to the sale of the drugs at the hotel,

---

**4.** Murdock apparently requested no such limiting instruction.

**5.** Wint also challenges his conviction for aiding and abetting the distribution of cocaine. We

are satisfied that a rational fact-finder need not have had a reasonable doubt that the evidence described above also satisfied the elements of that offense.

Bryan went alone to a nearby service station. At that time he could have called his wife, sent her to the authorities in Chicago, then alerted the local authorities to the presence of Wint, Murdock and the cocaine. In addition, Bryan testified that on previous trips to sell drugs he had never been accompanied by more than one person and never saw any weapons. Thus, it also appears that Bryan may have been able to follow the same course of action during one of his previous trips. That this alternative was reasonable is supported by the fact that neither he nor his wife were harmed after he allegedly talked with the police in Chicago. Moreover, Bryan testified that posse members did not escort his wife to and from work. Thus, it is reasonable to conclude that she could have reached safe haven without incident. Since Bryan had a reasonable, legal alternative to committing the crime that would have avoided the threatened harm, we conclude that the evidence was sufficient to support his convictions.

### V.

■■■■ Murdock and Wint challenge the district court's decision to depart upward under 18 U.S.C. § 3553(b) when sentencing them. We have adopted a three step procedure for reviewing departures.

> Under the first step, a reviewing court considers, as a question of law, whether the circumstances the district court relied on for departure are sufficiently unusual in kind or degree to warrant departure. Second, the court considers, as a question of fact under a clearly erroneous standard of review, whether the circumstances justifying departure actually exist. Finally, if the sentence passes the first two tests, the court determines if the sentence is reasonable. In making this determination, the reviewing court gives due regard to the district court's "superior 'feel' for the case" and does not lightly disturb the district court's decision to depart or the degree of departure.

*United States v. Crumb,* 902 F.2d 1337, 1339 (8th Cir.1990) (citation omitted). We have recognized that "departures pursuant to section 3553(b) were intended by the Commission to be allowed only in rare cases." *United States v. Johnson,* 908 F.2d 396, 399 (8th Cir.1990).

■■■■ The district court described its basis for departure as follows. The court recognized that the examples of obstructive conduct under United States Sentencing Commission, *Guidelines Manual,* § 3C1.1 (Nov. 1991), vary from producing a false document to threatening a co-defendant. *United States v. Murdock,* No. 4–91–71, Sentencing Transcript at 31 (D.Minn. Nov. 27, 1991). Here, however, Murdock and Wint not only threatened Bryan, they levelled death threats against his family. "The threats were ongoing and were both sincere and meant to be taken seriously." *United States v. Wint,* No. 4–91–71, Sentencing Transcript at 18 (D.Minn. Nov. 27, 1991) ("Wint Sent. Trans."). The court noted that U.S.S.G. § 2J1.2(b)(1) does provide for an eight-level increase where the obstructive conduct involved threats to cause physical injury. Such an increase, however, has no effect where, as here, the offense level for the underlying conduct exceeds the adjusted offense level for the obstruction offense. As the court stated,

> the application of the grouping provisions serve[s] to subsume the obstruction offense level into the underlying offense level. Here, the offense level for the underlying offense is greater than the offense level for the obstruction offense, even with the 8–level enhancement [under U.S.S.G. § 2J1.2(b)(1) ]. As such, the only further enhancement available to this Court to reflect the serious nature of the threats, is the generic 2–level enhancement under § 3C1.1.

*United States v. Wint,* No. 4–91–71(3), Sentencing Memorandum and Statement of Reasons at 7 (D.Minn. Dec. 2, 1991) ("Memorandum").

As a consequence, Murdock and Wint would receive the same two-level obstruction enhancement regardless of whether they made death threats or "asked [their] mothers[s] to come and lie on [their] be-

half." Wint Sent. Trans. at 19. An enhancement of this magnitude, the court concluded, did not reflect the serious, continuous nature of the threats nor the fact that they involved innocent family members. The court concluded that the Commission had not adequately considered "this unique configuration," and therefore departed upward from the guideline range of seventy-eight to ninety-seven months to 144 months, the equivalent of a four level increase. Memorandum at 7–8.

Murdock argues that the Sentencing Commission did adequately consider the circumstances present here. Application note three to § 3C1.1 lists "threatening, intimidating, or otherwise unlawfully influencing a co-defendant [or] witness" as an example of the sort of conduct to which a two level enhancement applies. This, Murdock contends, is precisely what he did when he threatened Bryan. Moreover, Murdock argues that application note six to that same section directly addresses the situation where the offense level for the underlying offense exceeds the adjusted offense level for an obstruction offense. It provides that, where a defendant is convicted of both an obstruction offense covered by § 2J1.2 and of an underlying offense, "the offense level ... will be the offense level for the underlying offense increased by the 2–level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater." U.S.S.G. § 3C1.1, comment. (n. 6). Thus, Murdock contends, the guidelines mandate that no more than a two-level enhancement apply for threatening a witness, even where the offense level for an obstruction offense is effectively subsumed within the offense level for an underlying offense. Since the guidelines address the instant circumstances, Murdock concludes, they are not sufficiently unusual to warrant departure.

We agree that application note 6 to § 3C1.1 does address this situation. Thus, the district court was not free to depart on the ground that grouping the offenses resulted in the greater offense level of Counts I and II subsuming the offense level of Count III, thereby effectively negating any punishment for Count III. *See United States v. Cox,* 921 F.2d 772, 774 (8th Cir.1990).

Nonetheless, the district court remained free to depart

> even though the reason for departure is taken into consideration in the guidelines (*e.g.,* as a specific offense characteristic or other adjustment), if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate.

U.S.S.G. § 5K2.0 (p.s.). *See also* U.S.S.G. Ch. 1, Pt. A(4)(b), p.s. (in "an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm," court may consider departure); *Williams v. United States,* — U.S. —, —, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992) (circumstances under which court may depart); *United States v. Kim,* 896 F.2d 678, 685 (2d Cir. 1990) (if aggravating factors not adequately considered by Commission, court may depart beyond guideline range specified under multi-count analysis of U.S.S.G. §§ 3D1.1–.5). Here, application note 6 to § 3C1.1 required that the offense level for Murdock and Wint equal the offense level for the underlying offense plus a two level enhancement for obstruction of justice. The district court held, however, that a two level enhancement was inadequate because of the unusual nature of the obstructive conduct.

Wint and Murdock were convicted under Count III for threatening Bryan. Section 3C1.1 lists threats against a witness as a type of obstruction to which a two level enhancement should apply. That provision does not, however, adequately account for the nature of Wint's and Murdock's conduct. Here, the threats were of death, not simply physical injury. The threats were ongoing and apparently sincere. *See United States v. Baez,* 944 F.2d 88, 90 (2d Cir.1991) (approving departure beyond two level obstruction enhancement where defendant abducted and threatened to kill informant); *United States v. Wade,* 931 F.2d 300, 306 (5th Cir.) (same, where among other things defendant obstructed

justice on numerous occasions and co-conspirator fired shots at person after defendant asked co-conspirator to threaten him), *cert. denied,* —— U.S. ——, 112 S.Ct. 247, 116 L.Ed.2d 202 (1991); *Drew,* 894 F.2d at 974 (asking third party to kill a witness sufficiently unusual to warrant departure beyond two level enhancement). The targets of the threats included not only Bryan, but also innocent third parties—his wife, family and anyone who was close to him. Finally, the threats occurred while Bryan was incarcerated, unable to protect his family or even to flee himself. Accordingly, we conclude that the circumstances here were sufficiently unusual to warrant departure because the guideline level prescribed for Wint's and Murdock's obstructive conduct inadequately accounted for the serious nature of that conduct.

We need not address the second step of the analysis, whether the court's factual basis for the departure was clearly erroneous, because Murdock and Wint do not challenge the court's factual findings. Finally, as to the reasonableness of the departure, we agree with the district court that in light of the offense level adjustments available for other offenses that endanger human life, a four level adjustment for Wint's and Murdock's threats was reasonable. *See, e.g.,* U.S.S.G. § 2A2.2 (two to six level increase for bodily injury in aggravated assault); § 2A4.1(b)(2) (two to four level increase for bodily injury in kidnapping); § 2B3.1(b)(3) (two to six level increase for bodily injury in robbery); § 2P1.1(b)(1) (five level increase for threat of force in prison escape).

The convictions and sentences are affirmed.

BRIGHT, Senior Circuit Judge, concurring.

I write separately in concurrence to emphasize that district judges still possess some discretion under guideline sentencing. The present case represents a good example of where the guideline commentaries fail to adequately or fully describe an offender's conduct or background. In those situations, the sentencing court possesses the power to depart upward or downward from the guideline prescribed sentence, and the appeals court should affirm, as we have done in this case.

A check of some of our cases indicates that we have frequently affirmed an upward departure. *See, e.g., United States v. Estrada,* 965 F.2d 651 (8th Cir.1992); *United States v. Davila,* 964 F.2d 778 (8th Cir.1992); *United States v. Lloyd,* 958 F.2d 804 (8th Cir.1992). But, in a seemingly inconsistent fashion, we have often refused to give the district court similar permission to depart downward from the guidelines. *See, e.g., United States v. Desormeaux,* 952 F.2d 182 (8th Cir.1991); *United States v. Shortt,* 919 F.2d 1325 (8th Cir.1990); *United States v. Neil,* 903 F.2d 564 (8th Cir.1990). Yet the same principles undergird a departure in either direction.

On analysis of the case under consideration, the circumstances warranting departure rest only upon the difference of the *degree* of obstructive conduct between examples given by the sentencing commission and the actual conduct of the defendants in this case. It seems to me that sentencing courts may similarly address a lesser degree of conduct than that described by the sentencing commission in making a downward departure in sentencing. On the precedent of this case, that sort of reduced sentence logically should be affirmed.