69 F.3d 419
 43 Fed. R. Evid. Serv. 225
 UNITED STATES of America, Plaintiff-Appellee,
v.
Milton EDWARDS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Terry RATLIFF, Sr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
William Thomas LAWRENCE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kerry CHAPLIN, Defendant-Appellant.
 Nos. 94-5202 to 94-5204 and 95-5003.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 24, 1995.
 
 William E. Hughes, Tulsa, Oklahoma, for Defendant-Appellant Milton Edwards.
 Richard D. Amatucci, Tulsa, Oklahoma, for Defendant-Appellant Terry Ratliff, Sr.
 Craig P. Bryant, Assistant Federal Public Defender, (Stephen J. Knorr, Federal Public Defender, with him on the brief), Tulsa, Oklahoma, for Defendant-Appellant William Thomas Lawrence.
 Reuben Davis (Laura L. Gonsalves, with him on the brief), Tulsa, Oklahoma, for Defendant-Appellant Kerry Chaplin.
 David E. O'Meilia, Assistant United States Attorney (Stephen C. Lewis, United States Attorney, with him on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee United States.
 Before BALDOCK and McWILLIAMS, Circuit Judges, and BROWN, District Judge.*
 BALDOCK, Circuit Judge.
 Defendants Milton Edwards, William Lawrence, Jr., Kerry Chaplin, and Terry Ratliff, Sr. were tried together and convicted in a jury trial of conspiracy to possess with intent to distribute cocaine and to distribute cocaine, 21 U.S.C. Secs. 846, 841(a)(1). Defendants Chaplin and Edwards were also convicted of use of a communication facility, a telephone, in facilitating a violation of federal narcotics laws, 21 U.S.C. Sec. 843(b). Defendants appeal their convictions and sentences. We exercise jurisdiction pursuant to 28 U.S.C. Sec. 1291 and 18 U.S.C. Sec. 3742(a). We affirm.[1]
 I. Facts
 Testimony and evidence presented during trial detailed the following course of events. The instant conspiracy arose in the summer of 1990, when Defendants Edwards and Ratliff began purchasing small quantities of cocaine from Balbino "Munchie" Tavarez in Houston, Texas for resale near their home in Atoka, Oklahoma.[2] Over the next two years, Edwards purchased increasing quantities of cocaine from Tavarez but experienced difficulties transporting the cocaine from Houston.
 In July 1992, Edwards approached Jerry Grist ("J. Grist") in Atoka, and proposed that J. Grist transport the cocaine from Houston to Tulsa through the use of J. Grist's trucking company employees. J. Grist agreed to this arrangement in exchange for payment of $1,000 per kilogram of cocaine transported. To carry out this plan, Edwards and Ratliff escorted J. Grist to Dallas, Texas to meet with Tavarez. There, J. Grist met with Tavarez, received instructions on making cocaine purchases, and observed Edwards purchase two kilograms of cocaine from Tavarez.
 In September 1992, Edwards was placed on probation for an unrelated 1990 drug charge and was placed in a halfway house. During Edwards' confinement, Tavarez arranged transactions directly with J. Grist for Edwards. At this point, Defendant Chaplin began purchasing cocaine from J. Grist which allowed him to obtain better quality cocaine than he was able to obtain on his own. In making these purchases, Chaplin pooled his money into a common fund with the other codefendants in order to make bulk purchases of cocaine, as the price of cocaine was less expensive when purchased in large quantities. At trial, J. Grist estimated that he or his employees routinely transported multiple kilograms of cocaine from Houston to Tulsa, at least every week, until his arrest on May 9, 1993. Once the cocaine arrived in Tulsa, J. Grist distributed the cocaine among the Defendants who had invested in the purchase.
 
 
 1
 In February 1993, the district court revoked Edwards' probation and sentenced him to prison. The following September, Edwards contacted J. Grist from prison and informed him that Ratliff would assume control of his portion of the operation. Specifically, Ratliff would communicate with the Defendants about their cocaine needs, collect the money, and place orders with J. Grist. Although Edwards later replaced Ratliff with Defendant Lawrence, Ratliff continued to receive cocaine from other Defendants and occasionally pooled his own funds with that of other Defendants to purchase cocaine from J. Grist.
 
 
 2
 In April 1993, state agents received an order from an Oklahoma state court authorizing the interception of telephone communications from two specific telephone numbers used by J. Grist at his home and trucking business in Atoka County, Oklahoma. Pursuant to the wiretap order, agents intercepted telephone conversations between J. Grist and Tavarez, some of which directly concerned the cocaine distribution operation involving Defendants. In particular, agents intercepted a phone call on May 7, 1993, which revealed that J. Grist planned to travel to Houston to purchase a multi-kilogram quantity of cocaine from Tavarez. On May 9, 1993, agents arrested J. Grist near Atoka, Oklahoma as he was returning from Houston. Four kilograms of cocaine were found in his possession, purchased with funds provided by Defendants Lawrence, Lewis, and Chaplin.
 
 
 3
 Following his arrest, J. Grist began cooperating with government agents regarding the drug distribution operation.[3] As part of his cooperation, J. Grist made several monitored telephone calls to Ratliff informing him that a "friend" from El Paso, Texas, was planning to visit Tulsa for the purpose of distributing cocaine. Unbeknownst to Ratliff, the "friend" was an undercover DEA Agent, Joe Leszczynski. Agent Leszczynksi contacted Ratliff on September 26, 1993, to discuss a potential drug transaction. In addition to his discussions with Ratliff, Agent Leszczynksi contacted Defendant Chaplin by telephone several times during October 1993 to arrange cocaine purchases. On November 2, 1993, Leszczynski called Chaplin to finalize a drug buy the next day. During this call, Chaplin discussed his past involvement with Defendants in purchasing cocaine through J. Grist.
 
 
 4
 On November 3, 1993, government agents recorded telephone calls made by a cooperating coconspirator, Herbert Grist ("H. Grist"), father of J. Grist. In these calls, H. Grist discussed a planned purchase of cocaine with Chaplin and Ratliff. Chaplin then met H. Grist at the Roadway Motel in Tulsa, in a room monitored by agents through the use of hidden video and audio transmitters. Agents observed Chaplin negotiate the purchase of one kilogram of cocaine. After Chaplin paid for the cocaine, agents arrested him.
 
 
 5
 Later the same day, H. Grist placed a telephone call to Ratliff to give him the motel and room number. However, for some reason, Ratliff did not meet H. Grist at the room and did not negotiate a purchase. Approximately 30 minutes after H. Grist spoke to Ratliff, Defendant Edwards contacted H. Grist at the motel room and arranged to meet to discuss a drug transaction. Shortly thereafter, Edwards and Defendant Lawrence met H. Grist at the motel room and agents monitored the meeting.
 
 
 6
 At the meeting, Edwards and Lawrence indicated that they did not want to pay cash for the cocaine but wanted it "fronted".[4] In accordance with instructions from DEA agents, H. Grist agreed to "front" two kilograms of cocaine to Edwards and Lawrence. After Lawrence took possession of the cocaine, agents arrested Edwards and Lawrence.
 
 
 7
 On January 26, 1994, Defendants were indicted for conspiracy to possess with intent to distribute cocaine and to distribute cocaine, 21 U.S.C. Secs. 846, 841(a)(1). In addition, Defendants Edwards and Chaplin were indicted for use of a communication facility, a telephone, in facilitating a violation of federal narcotics laws, 21 U.S.C. Sec. 843(b). Following their indictment, Defendants moved to suppress evidence obtained pursuant to a wiretap, claiming that the wiretap order was improperly issued. The district court denied the motion. On May 5, 1994, a jury found Defendants guilty as charged on all counts. This appeal followed.
 
 
 8
 On appeal, Defendants raise the following common issues challenging their convictions: (1) whether the district court erred in failing to suppress evidence obtained from a wiretap, and (2) whether a fatal variance existed between the indictment, which alleged a single conspiracy, and the government's proof at trial, which established the existence of multiple conspiracies.
 
 
 9
 In addition to these common issues, Defendant Chaplin challenges the sufficiency of the evidence as to his conspiracy conviction. Defendant Ratliff argues the district court erred in failing to grant his motion for severance. Defendants Edwards and Lawrence contend the district court erred in admitting evidence of prior bad acts pursuant to Fed.R.Evid. 404(b). Defendant Edwards filed a pro se supplemental brief appended to the opening brief filed by his attorney claiming that the district court erred by: (1) allowing "the jury selection process to continue after discovery of an impermissible disparity concerning African-Americans," and (2) denying a motion to depose Herbert Grist pursuant to Fed.R.Crim.P. 15(a).[5]
 
 
 10
 As to sentencing issues, all Defendants claim the district court erroneously calculated the quantity of cocaine used to determine their base offense levels. In addition, Defendant Edwards claims the district court improperly enhanced his sentence for (1) being an organizer or leader of the conspiracy, and (2) obstruction of justice. Defendants Lawrence and Chaplin seek to incorporate all arguments raised by their codefendants insofar as they apply to their particular appeals. We address Defendants' arguments in turn.
 
 II. Motion to Suppress
 
 11
 Defendants first contend the district court erred in denying their motion to suppress evidence obtained pursuant to a wiretap. Specifically, Defendants contend that the wiretap application and order were invalid because the district attorney who applied for the wiretap order was without jurisdiction to do so. In addition, Defendant Ratliff contends the application for a wiretap contained an insufficient showing of requisite necessity for interception and that the government failed to minimize the telephone conversations monitored. On appeal from a motion to suppress, we accept the district court's factual findings unless clearly erroneous, review questions of law de novo, and view the evidence in the light most favorable to the prevailing party. United States v. Williamson, 1 F.3d 1134, 1135 (10th Cir.1993).
 
 
 12
 A. Jurisdiction of District Attorney to Apply for Order
 
 
 13
 The wiretap order in question was obtained pursuant to the Oklahoma Security of Communications Act, Okla.Stat.Ann. tit. 13, Secs. 176.1-.14. Under the federal wiretap statute, 18 U.S.C. Sec. 2516(2), we must defer to state law " 'on the question of the validity of [a] wiretap order obtained in state court under state law.' " United States v. Tavarez, 40 F.3d 1136, 1137 (10th Cir.1994) (quoting United States v. McNulty, 729 F.2d 1243, 1266 (10th Cir.1983) (en banc)). We review a district court's determination of state law de novo. Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 1220-21, 113 L.Ed.2d 190 (1991).
 
 
 14
 Section 176.9(C) of the Oklahoma wiretap statute authorizes the "interception of wire ... communications within the territorial jurisdiction ... of the district attorney requesting the order." Okla.Stat.Ann. tit. 13, Sec. 176.9(C). The application for a wiretap in the instant case sought authorization to intercept telephone conversations from two telephones located in Atoka County, Oklahoma, located in Judicial District 19. The district attorney who applied for the wiretap resided in Judicial District 21, located in Cleveland County, where the agents monitored the conversations.
 
 
 15
 Under Sec. 176.9(C), Defendants contend "interception" of communications occurs only where the tapped phones are physically located. Because the tapped phones were located in Judicial District 19, Defendants contend the district attorney for District 21 did not have authority to apply for the order because he did not reside in the district where the phones were physically located. Accordingly, Defendants contend that the wiretap authorization was invalid and that the district court should have suppressed all evidence obtained pursuant to the wiretap.
 
 
 16
 We rejected a similar challenge to the validity of the wiretap in question in Tavarez. In Tavarez, the defendant argued that the district attorney who applied for the wiretap in the instant case was without jurisdiction to do so because he did not reside in the judicial district where the tapped phones were physically located. Tavarez, 40 F.3d at 1138. In rejecting this argument, we held that under the Oklahoma wiretap statute, jurisdiction to apply for an order vests not only in the judicial district where the mechanical devices are located, but also "in the place where the contents of the communication are first heard by law enforcement officials." Id. Because the district attorney who applied for the wiretap order resided in the district where the phone conversations were first heard by DEA Agents, we concluded the district attorney properly had jurisdiction. Id.
 
 
 17
 Defendants concede that our decision in Tavarez upheld the validity of the wiretap in question. Defendants contend, however, that they were not a party to that case and that we should reconsider the issue and reach a different result. We disagree. We are bound by our authoritative construction of the Oklahoma wiretap statute in Tavarez absent an intervening Supreme Court precedent or en banc reconsideration. United States v. Brittain, 41 F.3d 1409, 1415 (10th Cir.1994). Accordingly, we must follow the Tavarez panel's construction of the Oklahoma wiretap statute in the instant case. Under Tavarez, jurisdiction to apply for a wiretap order under the Oklahoma wiretap statute vests "in the place where the contents of the communication are first heard by law enforcement officials." Tavarez, 40 F.3d at 1138. Because the intercepted communications were first heard by law enforcement officials in District 21, the district attorney for District 21 had authority to apply for the order. Thus, the district court did not err in rejecting Defendants' jurisdictional challenge to the wiretap order.[6]
 
 B. Requisite Necessity for Interception
 
 18
 Defendant Ratliff contends the affidavit for wiretap authorization contained an insufficient showing that the wiretap was necessary for agents to determine the nature and scope of the criminal activity in question. Specifically, Defendant contends that the affidavit failed to indicate that normal investigative techniques were attempted and failed prior to resort to a wiretap.
 
 
 19
 " 'A wiretap authorization order is presumed proper,' and the Defendants carry the burden of overcoming this presumption." United States v. Mondragon, 52 F.3d 291, 292 (10th Cir.1995) (quoting United States v. Nunez, 877 F.2d 1470, 1472 (10th Cir.), cert. denied, 493 U.S. 981, 110 S.Ct. 513, 107 L.Ed.2d 515 (1989)). We review de novo whether the order complies with the necessity requirement. Id.
 
 
 20
 In the instant case, the wiretap order was issued pursuant to the Oklahoma wiretap statute. Okla.Stat.Ann. tit. 13, Sec. 176.9. The provisions of the Oklahoma wiretap statute are virtually identical to the federal wiretap statute. Compare Okla.Stat.Ann. tit. 13, Sec. 176.9 with 18 U.S.C. Sec. 2518(1)(c). Under the Oklahoma statute, each application for a wiretap must include "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be either unlikely to succeed if tried or are too dangerous." Okla.Stat.Ann. tit. 13, Sec. 176.9(A)(3); see also 18 U.S.C. Sec. 2518(1)(c). This is known as the necessity requirement. See Mondragon, 52 F.3d at 293. In addition, the judge issuing the order must make a finding that "[n]ormal investigative procedures have been tried and have failed or reasonably appear to be either unlikely to succeed if tried or are too dangerous." Okla.Stat.Ann. tit. 13, Sec. 176.9(C)(3); see also 18 U.S.C. Sec. 2518(3)(c). The purpose of these requirements is to ensure that the relatively intrusive device of wiretapping "is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974).
 
 
 21
 In examining necessity challenges to wiretap orders, we have repeatedly held that law enforcement officials are not required "to exhaust all other conceivable investigative procedures before resorting to wiretapping." United States v. Apodaca, 820 F.2d 348, 350 (10th Cir.), cert. denied, 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 202 (1987); accord United States v. Page 808 F.2d 723, 729 (10th Cir.) ("[A] wiretap authorization can be issued even if every possible means of investigation has not been tried."), cert. denied, 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987). Consequently, we have upheld applications for wiretap orders where the application indicated: (1) several investigatory methods had been utilized prior to resort to wiretapping, see, e.g., Page, 808 F.2d at 729; (2) normal investigative techniques had been frustrated "by various problems local police were unable to overcome," United States v. Armendariz, 922 F.2d 602, 607 (10th Cir.1990), cert. denied, 502 U.S. 823, 112 S.Ct. 87, 116 L.Ed.2d 59 (1991); (3) increased visual surveillance would have increased the possibility of detection, see Apodaca, 820 F.2d at 350; and (4) potential witnesses were unwilling to testify in court because of fear of reprisal, United States v. Smaldone, 583 F.2d 1129, 1133 (10th Cir.1978), cert. denied, 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40 (1979).
 
 
 22
 In the instant case, the application for a wiretap order set forth a full and complete statement as to the investigative techniques and procedures which had been utilized prior to resort to a wiretap. See Vol. 1, tab 52, ex. B. Moreover, the state court issuing the order found that "[n]ormal investigative procedures have been tried" and have been unsuccessful. See Vol. 1, tab 32, ex. C. We therefore conclude there was a sufficient explanation indicating that a wiretap was necessary. Thus, the district court did not err in rejecting Defendant's necessity challenge.
 
 C. Minimization
 
 23
 Defendant Ratliff also contends that the intercepted calls were not minimized in violation of the Oklahoma wiretap statute. We conclude Defendant has failed to properly present this issue for appellate review. Fed.R.App.P. 28(a)(5) states: "The brief of the appellant shall contain ... an argument.... The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." In enforcing this rule, we have held that "[i]t is insufficient merely to state in one's brief that one is appealing an adverse ruling below without advancing reasoned argument as to the grounds for appeal." American Airlines v. Christensen, 967 F.2d 410, 415 n. 8 (10th Cir.1992).
 
 
 24
 In the instant case, Defendant fails to support his minimization issue with any reasoned argument or citations to the record. Indeed, Defendant has made no attempt to demonstrate how minimization efforts were improper other than a conclusory statement that "[t]here was not minimization of the telephone calls monitored." Brief of Aplt. Ratliff at 19. This isolated sentence is insufficient to adequately contest his conviction on this ground on appeal. Consequently, we do not address Defendant's minimization argument.
 
 III. Sufficiency of the Evidence and Variance
 
 25
 Defendant Chaplin contends the district court erred in denying his motion for judgment of acquittal because the evidence was insufficient to support his conspiracy conviction. Alternatively, Chaplin joins his codefendants in arguing that there was a fatal variance between the indictment, which alleged a single conspiracy, and the government's proof at trial, which established the existence of multiple conspiracies. We address each argument in turn.
 
 A. Sufficiency of the Evidence
 
 26
 Chaplin contends the evidence was insufficient to prove he knowingly agreed to join the conspiracy with his codefendants to distribute cocaine. Specifically, Chaplin contends the evidence fails to establish direct transactional links, or even acquaintanceship, between him and his codefendants. In reviewing a conviction for sufficiency of the evidence, we examine the entire record in the light most favorable to the government, and determine whether the direct and circumstantial evidence is such that any reasonable jury could find the defendant guilty beyond a reasonable doubt. United States v. Pedraza, 27 F.3d 1515, 1524 (10th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 347, 130 L.Ed.2d 303 (1994).
 
 
 27
 In order to prove Chaplin was guilty of conspiracy with his codefendants, the government was required to prove: " '(1) agreement with another person to violate the law; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement; and (4) interdependence among the alleged coconspirators.' " Id. (quoting United States v. Johnson, 12 F.3d 1540, 1545 (10th Cir.1993)). "To establish that [Chaplin] agreed to participate in the conspiracy, the [g]overnment's evidence must show a unity of purpose or a common design and understanding with coconspirators to accomplish one or more of the objects of the conspiracy." United States v. Angulo-Lopez, 7 F.3d 1506, 1510 (10th Cir.1993) (quotation omitted), cert. denied, --- U.S. ----, 114 S.Ct. 1563, 128 L.Ed.2d 209 (1994). "[T]he requisite agreement to act in concert need not result in any ... formal [hierarchical] structure." United States v. Banks, 10 F.3d 1044, 1054 (4th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1850, 128 L.Ed.2d 475 (1994).
 
 
 28
 In the instant case, the evidence was sufficient to show "a unity of purpose" among Defendants. Angulo-Lopez, 7 F.3d at 1510. The evidence at trial indicated that J. Grist or his trucking company employees would periodically travel to Houston to purchase cocaine, and divide the cocaine among the defendants upon return to Tulsa. In order to effectuate these purchases, Chaplin pooled his money into a common fund with his codefendants so that J. Grist could make large purchases of cocaine at a favorable price.[7] By participating in these bulk purchases, Chaplin also obtained better quality cocaine. This evidence demonstrates an ongoing course of conduct between Defendants in order to achieve a common goal or purpose: to profit from the illicit distribution of cocaine. See United States v. Fox, 902 F.2d 1508, 1515 (10th Cir.), cert. denied, 498 U.S. 874, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990); United States v. Dickey, 736 F.2d 571, 582 (10th Cir.) ("There was sufficient evidence to show that the conspiracy was comprised of a common goal between all participants, i.e., to possess and distribute drugs ... for profit."), cert. denied, 469 U.S. 876, 105 S.Ct. 240, 83 L.Ed.2d 179 (1984).
 
 
 29
 Chaplin contends, however, the element of interdependence is lacking in the instant case because "there is no evidence that any of his codefendants knew [him], associated with [him], or knew that [he] was also purchasing cocaine." Brief of Aplt. Chaplin at 12. Rather, Chaplin contends that the only connection between him and his codefendants was their dependence on J. Grist as the common, central drug supplier. Id. at 13. Thus, Chaplin argues that "[t]o find 'interdependence' among [him] and his codefendants under these circumstances would render the word meaningless." Reply Brief of Aplt. Chaplin at 17. We disagree.
 
 
 30
 The mere presence of a central figure does not necessarily establish interdependence in a single conspiracy. United States v. Roberts, 14 F.3d 502, 511 (10th Cir.1993). Rather, interdependence exists where "each co-conspirators' activities 'constituted essential and integral steps toward the realization of a common, illicit goal.' " Fox, 902 F.2d at 1514 (quoting United States v. Brewer, 630 F.2d 795, 799 (10th Cir.1980)); see also Evans, 970 F.2d at 671 ("What is needed is proof that [the conspirators] intended to act together for their shared mutual benefit within the scope of the conspiracy charged."). Moreover, in order to establish interdependence, the government need not show that the "[c]oconspirators ... know the identities or details of each scheme or have connections with all other members of the conspiracy." Roberts, 14 F.3d at 511. Rather, where large quantities of drugs are being distributed through a key distributor, "each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know." Dickey, 736 F.2d at 581.
 
 
 31
 We conclude the government presented ample evidence establishing the element of interdependence in the instant case. The scheme for distributing cocaine depended upon the successful achievement of several integrated steps, including transport of numerous purchases of cocaine from Houston, collection of money from Defendants, pooling of money in order to purchase large quantities of cocaine, and delivery of the cocaine to Defendants in Oklahoma for resale to cocaine consumers. See Fox, 902 F.2d at 1515 (finding requisite interdependence where defendants pooled funds and made several wholesale purchases of cocaine). Moreover, the fact that Chaplin's coconspirators were allegedly unaware of his identity or that he was purchasing cocaine is irrelevant. See Roberts, 14 F.3d at 511. By participating in purchases of large quantities of drugs, all Defendants necessarily had knowledge of participation in a greater scheme. See Dickey, 736 F.2d at 581. Accordingly, we find sufficient evidence from which any reasonable jury could find that Chaplin knowingly conspired with his codefendants to distribute cocaine. Thus, the district court properly denied Chaplin's motion for judgment of acquittal.
 
 
 32
 B. Variance and Multiple Conspiracy Jury Instruction
 
 
 33
 Defendants contend that there was a fatal variance between the indictment, which alleged a single conspiracy, and the government's proof at trial, which established the existence of multiple conspiracies. Specifically, Defendants contend that Chaplin's drug activities constituted a separate, independent conspiracy to those of his codefendants and that evidence of this separate conspiracy created a prejudicial "spillover". Additionally, Defendants contend the district court erred by failing to give a multiple conspiracy jury instruction.
 
 1.
 
 34
 "A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." Dunn v. United States, 442 U.S. 100, 105, 99 S.Ct. 2190, 2193, 60 L.Ed.2d 743 (1979). However, a variance is not fatal to the government's case unless the variance affects "the substantial rights of the accused." Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935). Accordingly, where a single conspiracy is charged in the indictment, and the government proves only multiple conspiracies, a defendant who suffers substantial prejudice must have his conviction reversed. Kotteakos v. United States, 328 U.S. 750, 773-74, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946).
 
 
 35
 Whether a single conspiracy existed is a fact question for the jury and we review the jury's decision in a light most favorable to the government. United States v. Powell, 982 F.2d 1422, 1431 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993). In determining whether a single conspiracy existed, a focal point of the analysis is whether the alleged coconspirators' conduct exhibited interdependence. United States v. Daily, 921 F.2d 994, 1007 (10th Cir.1990), cert. denied, 502 U.S. 952, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991). Interdependence exists where "each coconspirators activities 'constituted essential and integral steps toward the realization of a common, illicit goal.' " Fox, 902 F.2d at 1514 (quoting United States v. Brewer, 630 F.2d 795, 799 (10th Cir.1980)).
 
 
 36
 Defendants assert the evidence failed to show a single conspiracy because the evidence fails to show any connection between Chaplin and the other defendants. Rather, Defendants contend that the evidence essentially consists of testimony showing a number of discrete buy-sell transactions by the various codefendants from J. Grist, the supplier of the cocaine.
 
 
 37
 This argument "considerably shades and understates the relevant evidence of [Defendants'] conduct" in the instant case. Banks, 10 F.3d at 1055. As we have already stated, there was ample evidence demonstrating interdependence among Defendants in their scheme to purchase, transport, and deliver cocaine from Houston to Tulsa. See supra part III.A. Throughout this scheme, each Defendant " 'demonstrated a substantial level of commitment to the conspiracy, [for example] by engaging in a consistent series of smaller transactions' that furthered its ultimate object of supplying the consumer demand of the market." Id. at 1054 (quoting United States v. Edwards, 945 F.2d 1387, 1393 (7th Cir.1991)). Accordingly, we conclude the evidence supports the jury's conclusion that Defendants were members of a single conspiracy as charged in the indictment. Thus, no variance existed.
 
 2.
 
 38
 Even assuming a variance between the indictment and the proof at trial, Defendants are not entitled to relief unless the variance affected their substantial rights. See Powell, 982 F.2d at 1432 (addressing substantial rights prong even though court concluded no variance existed); United States v. Irwin, 654 F.2d 671, 683 (10th Cir.1981) (same). Defendants Edwards, Lawrence, and Ratliff contend that evidence of Chaplin's alleged separate conspiracy affected their substantial rights by creating a "spillover" effect which forced them "to acquit [themselves] of Chaplin's actions."
 
 
 39
 A defendant's substantial rights are affected in the context of a variance when the jury determines a defendant's guilt by relying on evidence adduced against coconspirators who were involved in separate conspiracies. Kotteakos, 328 U.S. at 774, 66 S.Ct. at 1252. In evaluating whether a potential prejudicial spillover impermissibly affected the fairness of a trial in which a variance occurred, we have considered the following factors: (1) whether the proliferation of separate conspiracies in the case affected the jury's ability to segregate each defendant's individual actions and participation; (2) whether the variance caused confusion among the jurors as to the limited use of certain evidence; and (3) the strength of the evidence underlying the conviction. Powell, 982 F.2d at 1432.
 
 
 40
 Applying these factors to the instant case, we conclude Defendants' substantial rights were not affected by any alleged variance. The facts of this case were not so intricate as to render the jury unable to segregate the evidence associated with each defendant's individual actions, where there were only four defendants and alleged proof of two conspiracies. See Berger, 295 U.S. at 83, 55 S.Ct. at 631 (upholding conviction for participation in a single conspiracy where there were only five defendants and two conspiracies proven at trial). Moreover, the district court's jury instructions minimized any possible prejudice. The court's instructions advised the jury that "[i]t is your duty to give separate and individual consideration to the evidence as it relates to each individual defendant [and] leav[e] out of consideration entirely any evidence admitted solely against some other defendant or defendants." See Vol. I, Tab 96, p. 6. Finally, ample evidence established a single conspiracy. See supra part III.B.1. We therefore conclude that even assuming a variance existed, Defendants' substantial rights were not affected.
 
 3.
 
 41
 Defendants next contend the district court erred in failing to give a multiple conspiracy jury instruction. When reviewing a challenge to jury instructions, we consider the instructions given as a whole to determine whether the instructions adequately state the law and provide the jury with an ample understanding of the issues and controlling principles of law. Brown v. Wal-Mart Stores, Inc., 11 F.3d 1559, 1564 (10th Cir.1993). We review the district court's exclusion of a jury instruction for an abuse of discretion. Id.
 
 
 42
 "A multiple conspiracy charge instructs the jury to acquit if it finds that the defendant was not a member of the indicted conspiracy but rather was involved in another conspiracy." United States v. Cavin, 39 F.3d 1299, 1310 (5th Cir.1994). In Evans, we held that a district court's failure to give a multiple conspiracy jury instruction is not reversible error as long as the instructions informed the jury that " 'the government had the burden of proving beyond a reasonable doubt the [single] conspiracy as alleged, and that the evidence should be considered separately as to each individual defendant.' " Evans, 970 F.2d at 675 (quoting United States v. Watson, 594 F.2d 1330, 1340 (10th Cir.), cert. denied, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979)). In the instant case, the jury was so instructed.[8] Accordingly, we conclude the district court did not abuse its discretion in declining to instruct the jury on multiple conspiracies.[9]
 
 IV. Severance Motion
 
 43
 Defendant Ratliff contends the district court erred in denying his motion for severance because the district court's decision to try him jointly with his codefendants prejudiced him.[10] Specifically, Defendant claims that evidence admitted against his codefendants in the form of statements made by Edwards to a police officer and a videotape of the November 3, 1993 cocaine sale between the undercover agent and Chaplin, had a negative "spillover" effect on the jury and prevented the jury from making a reliable judgment about his guilt or innocence. We disagree.
 
 
 44
 "[I]n a conspiracy trial it is preferred that persons charged together be tried together." United States v. Scott, 37 F.3d 1564, 1579 (10th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 773, 130 L.Ed.2d 669 (1995). We review a district court's denial of a severance motion for an abuse of discretion, United States v. Williams, 45 F.3d 1481, 1483 (10th Cir.1995), and "will not reverse the lower court's decision absent a strong showing of prejudice." United States v. Wright, 932 F.2d 868, 876 (10th Cir.), cert. denied, 502 U.S. 962, 972, 112 S.Ct. 428, 450, 116 L.Ed.2d 448, 467 (1991). Prejudice occurs when " 'there is a serious risk that a joint trial [will] compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' " Williams, 45 F.3d at 1484 (quoting Zafiro v. United States, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)). "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' [of damaging evidence] is sufficient to warrant severance." United States v. Levine, 983 F.2d 165, 167 (10th Cir.1992) (quotations omitted).
 
 
 45
 We conclude Defendant has failed to show the requisite prejudice warranting severance. As we have stated, the facts of this case were not so intricate as to render the jury unable to segregate the evidence associated with each defendant's individual actions. See supra part III.B.2. Moreover, the district court minimized any possible prejudice by instructing the jury that "[i]t is your duty to give separate and individual consideration to the evidence as it relates to each individual defendant [and] leav[e] out of consideration entirely any evidence admitted solely against some other defendant or defendants." See Vol. I, Tab 96, p. 6; Zafiro, 113 S.Ct. at 938 ("[L]imiting instructions ... often will suffice to cure any risk of prejudice."). Under these circumstances, we conclude the district court did not abuse its discretion in denying Defendant's motion to sever.
 
 V. 404(b) Evidence
 
 46
 Defendants Edwards and Lawrence contend the district court erred in admitting evidence of prior bad acts pursuant to Fed.R.Evid. 404(b). We review the district court's decision to admit evidence under Rule 404(b) for an abuse of discretion. United States v. Patterson, 20 F.3d 809, 812 (10th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 128, 130 L.Ed.2d 72 (1994).
 
 
 47
 During trial, the government moved to admit excerpts from testimony given by Edwards and Lawrence as government witnesses at an unrelated 1991 cocaine conspiracy trial in the Northern District of Oklahoma. The excerpts included testimony in which Edwards and Lawrence testified that they had known each other for at least five or six years and became involved in the cocaine business in 1986. Edwards testified that he had purchased two to three kilograms of cocaine from Lawrence in 1986 and began purchasing cocaine in Los Angeles and Houston for resale in Tulsa, in 1988. Lawrence testified that he and Edwards had made two or three trips to Houston to purchase cocaine, and would place the cocaine inside a spare tire before returning to Tulsa.
 
 
 48
 The government offered the prior testimony in order to rebut Defendants' contention that they were not involved in a cocaine conspiracy with each other and with J. Grist. Thus, under Rule 404(b), the government contended that the prior testimony showed knowledge of the charged conspiracy and an absence of mistake. Defendants objected to the admission of the testimony contending that even if the evidence was admitted for a proper purpose under Rule 404(b), the evidence was more prejudicial than probative and should be excluded. The district court overruled the objection stating that "[i]t's the view of the Court that such evidence of prior statements, activities would ... go to the issues of motive, knowledge, opportunity, and absence of mistake or accident, and would therefore be appropriate."[11] Vol. XI at 804. The court therefore admitted the prior testimony.
 
 
 49
 Defendants contend the district court improperly admitted the prior testimony under Rule 404(b) because the evidence related to events which occurred in 1988 and was thus too remote in time to the events charged in the instant case. Consequently, Defendants contend that the probative value of the evidence was substantially outweighed by its prejudicial impact.[12]
 
 
 50
 Evidence of a defendant's prior crimes, wrongs, or acts is "admissible only for limited purposes and only when various prerequisites are satisfied." United States v. Robinson, 978 F.2d 1554, 1558 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1855, 123 L.Ed.2d 478 (1993). Rule 404(b) requires that
 
 
 51
 (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed.R.Evid. 105, the trial court shall, upon request, instruct the jury that the evidence of similar acts is to be considered only for the proper purpose for which it was admitted.
 
 
 52
 United States v. Johnson, 42 F.3d 1312, 1315 (10th Cir.1994) (quotation omitted). " 'We have previously recognized the highly probative value of uncharged prior acts evidence to show motive, intent, knowledge or plan in the context of a conspiracy prosecution.' " United States v. Easter, 981 F.2d 1549, 1554 (10th Cir.1992) (quoting United States v. Record, 873 F.2d 1363, 1375 (10th Cir.1989)), cert. denied, --- U.S. ----, 113 S.Ct. 2448, 124 L.Ed.2d 665 (1993). This is particularly true where the uncharged acts are similar in method to the charged conspiracy and sufficiently close in time. Id.
 
 
 53
 Here, Defendants' prior acts involved their joint efforts regarding distribution of cocaine purchased in and transported from Houston, Texas--a similar scheme with which Defendants were eventually charged--and were sufficiently close in time to the charged conduct. See United States v. Wint, 974 F.2d 961, 967 (8th Cir.1992) (narcotics offense committed five years earlier was "reasonably close in time" to charged offense), cert. denied, --- U.S. ----, 113 S.Ct. 1001, 122 L.Ed.2d 151 (1993); United States v. Drew, 894 F.2d 965, 970 (8th Cir.) (evidence of defendant's participation in running drug house three years earlier to offense in question probative of issues of intent, knowledge, and plan), cert. denied, 494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990). In this context, the prior acts evidence was highly relevant to show Defendants' knowledge of the plan or scheme to possess and distribute cocaine. Furthermore, the prior acts evidence rebutted Defendants' claim that they were not involved in a cocaine conspiracy with each other. See Easter, 981 F.2d at 1554 (upholding the admission of prior acts evidence under similar circumstances).
 
 
 54
 In addition, the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice. Although the district court did not explicitly rule on the prejudicial impact of the evidence, the court admitted the evidence following Defendants' objections based upon prejudice. Thus, "we can assume the judge weighed the prejudicial impact against the probative value of the evidence", Patterson, 20 F.3d at 814, before making the final determination to admit the prior testimony. Because "[w]e are required to give the trial court 'substantial deference' in Rule 403 rulings", id. (quoting Easter, 981 F.2d at 1554), we will not disturb the district court's implicit determination regarding the probative value of the evidence. See id. Moreover, the district court's jury instructions included an instruction limiting the use of the prior acts evidence. Under these circumstances, we conclude the district court did not abuse its discretion in admitting the prior acts evidence pursuant to Rule 404(b).
 
 VI. Defendant Edwards' Pro Se Issues
 A. Composition of Jury Venire
 
 55
 Defendant Edwards contends the district court erred because it "allow[ed] the jury selection process to continue after discovery of an impermissible disparity concerning underrepresentation of a fair cross-section of African-Americans" on the jury venire. According to Defendant Edwards, "[t]he seventy person jury venire presented for jury selection in this matter included only one non-caucasian, leaving a strong inference [of] ... impropriety." Specifically, Defendant Edwards argues that "it is beyond belief that in Tulsa County, where a 9.8% of African-Americans reside, that zero-percent African-Americans are summoned for the jury venire."[13] Defendant Edwards contends that we remand for the district court to conduct an evidentiary hearing regarding the alleged systematic exclusion of African-American venire persons.
 
 
 56
 "A criminal defendant has a Sixth Amendment right to a jury pool comprised of a fair cross section of the community." United States v. Robertson, 45 F.3d 1423, 1439 (10th Cir.) (citing Duren v. Missouri, 439 U.S. 357, 358-59, 99 S.Ct. 664, 665-66, 58 L.Ed.2d 579 (1979)), cert. denied, --- U.S. ----, --- U.S. ----, 115 S.Ct. 2258, 115 S.Ct. 2259, 132 L.Ed.2d 265, 132 L.Ed.2d 265 (1995). To establish a prima facie violation of the Sixth Amendment-based fair-cross-section requirement,
 
 
 57
 the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
 
 
 58
 Duren, 439 U.S. at 364, 99 S.Ct. at 668; see also United States v. Yazzie, 660 F.2d 422, 425-26 (10th Cir.1981), cert. denied, 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 464 (1982).
 
 
 59
 We conclude Defendant Edwards has failed to establish a prima facie violation of the fair-cross-section requirement. Although Defendant Edwards relies on statistics outside the record in an attempt to show that the representation of African-Americans is "not fair and reasonable in relation to the number of such persons in the community," Duren, 439 U.S. at 364, 99 S.Ct. at 668, Defendant Edwards has failed to show that a "systematic exclusion" of African-Americans occurred. By chance, the venire had one non-caucasian. In the absence of a showing of a "systematic exclusion" of African-Americans, Defendant Edwards has failed to demonstrate a prima facie violation of the fair-cross-section requirement. See Duren, 439 U.S. at 364, 99 S.Ct. at 668-69; Robertson, 45 F.3d at 1439. Consequently, we reject Defendant Edward's request to remand to the district court for an evidentiary hearing.
 
 B. Fed.R.Crim.P. 15
 
 60
 Defendant Edwards next argues that the district court erred in denying his motion to depose H. Grist pursuant to Fed.R.Crim.P. 15. We disagree.
 
 
 61
 Fed.R.Crim.P. 15 governs depositions in criminal proceedings. Rule 15(a) provides in relevant part:
 
 
 62
 (a) When Taken. Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition....
 
 
 63
 Fed.R.Crim.P. 15(a). Rule 15 "does not contemplate use of depositions of adverse witnesses as discovery tools in criminal cases." United States v. Carrigan, 804 F.2d 599, 602 (10th Cir.1986). Instead, the "exceptional circumstances" standard of Rule 15(a) requires that the district court exercise "its discretion in determining whether a deposition should be taken under the particular circumstances presented." United States v. Fuentes-Galindo, 929 F.2d 1507, 1509 (10th Cir.1991). We review the district court's decision regarding the taking of a deposition under Rule 15(a) for an abuse of discretion. Id.
 
 
 64
 Prior to trial in the instant case, the government informed Defendants that it would not call H. Grist as a witness. H. Grist, the father of J. Grist, had acted as the cooperating coconspirator with the government in the November 3, 1993 drug transactions at the Roadway Motel. Although the government did not intend to call H. Grist as a witness, the government intended to introduce videotape at trial of the drug transactions wherein H. Grist appeared. After Defendants learned the government did not intend to call H. Grist as a witness, Defendants' investigator personally interviewed H. Grist several weeks before trial. Although the investigator interviewed H. Grist, neither Defendant Edwards nor Lawrence subpoenaed H. Grist as a witness.
 
 
 65
 On April 29, 1994, several days into the trial, Defendants Edwards and Lawrence filed a motion pursuant to Fed.R.Crim.P. 15(a) to take the deposition of H. Grist. Defendants Edwards and Lawrence argued that the deposition was necessary because H. Grist would provide exculpatory testimony. Specifically, Defendant Edwards contended that H. Grist would state that Defendant Edwards had said during the November 3, 1993 transaction at the Roadway Motel in Tulsa that he was no longer in the drug business. Further, Defendant Edwards argued that H. Grist would testify that Defendant Edwards did not go to the Roadway Motel to purchase cocaine but to visit Grist, a family friend. Defendant Lawrence argued that H. Grist would state that he did not know Defendant Lawrence before the November 3, 1993 incident, thereby negating the inference that Lawrence and Grist knew one another as coconspirators. Because H. Grist was suffering from a heart condition and in poor health, his doctor recommended that he not be deposed.
 
 
 66
 The district court first observed that H. Grist's doctor had advised against a deposition because of the fragility of his health. The district court also established that H. Grist's competency was in question because he had been subject to oxygen deprivation. Finally, the district court stated that the allegedly exculpatory information H. Grist would provide in a deposition "is not that important." Consequently, the district court denied the motion to depose H. Grist pursuant to Rule 15. Vol. IX at 361-62. Under the particular circumstances of this case we cannot say the district court abused its discretion in denying Defendants' motion to depose H. Grist pursuant to Fed.R.Crim.P. 15(a). See Fuentes-Galindo, 929 F.2d at 1509. Consequently, we conclude the district court did not err in denying Defendants' motion to depose H. Grist.
 
 VII. Sentencing Issues
 A. Quantity of Cocaine
 
 67
 Defendants contend the district court erroneously calculated the quantity of cocaine used to determine their base offense levels. Specifically, Defendants contend their sentences were based upon a greater amount of cocaine than was reasonably foreseeable as part of the conspiracy. We review a district court's drug quantity calculation under a clearly erroneous standard "and we will not disturb it unless it has no support in the record, or unless after reviewing all the evidence we are firmly convinced that an error has been made." United States v. Clark, 57 F.3d 973, 977 (10th Cir.1995) (quoting United States v. Cook, 949 F.2d 289, 296 (10th Cir.1991)).
 
 
 68
 In a drug conspiracy case, a defendant's sentence is not based merely upon " 'the amount with which the defendant dealt personally.' " Angulo-Lopez, 7 F.3d at 1512 (quoting United States v. Savage, 891 F.2d 145, 151 (7th Cir.1989)). Rather, "[a] defendant ... is sentenced based on the total amount of drugs involved as if the object of the conspiracy had been completed, provided that the drug quantities were reasonably foreseeable to the defendant and within the scope of his conspiratorial agreement." United States v. Robertson, 45 F.3d 1423, 1445 (10th Cir.) (citation omitted), cert. denied, --- U.S. ----, 115 S.Ct. 2258, 132 L.Ed.2d 265 (1995). The government must prove the quantity of drugs for sentencing purposes by a preponderance of the evidence. United States v. Richards, 27 F.3d 465, 468 (10th Cir.1994). Evidence used to establish the drug quantities "must possess a 'minimum indicia of reliability.' " United States v. Reyes, 40 F.3d 1148, 1150 (10th Cir.1994) (quoting United States v. Coleman, 947 F.2d 1424, 1428 (10th Cir.1991), cert. denied, 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992)).
 
 
 69
 1. Defendants Chaplin, Ratliff, and Lawrence
 
 
 70
 The district court attributed a quantity of cocaine in excess of fifteen kilograms to Defendants Chaplin, Ratliff, and Lawrence, yielding a base offense level of thirty-four, see U.S.S.G. Sec. 2D1.1(c)(3) (providing for a base offense level of thirty-four for an amount of "[a]t least 15 kg but less than 50 kg of Cocaine"), and a guideline range of 151-188 months. Defendants contend that in calculating this quantity, the district court improperly sentenced them for drugs distributed independently by other members of the conspiracy because the amounts were not reasonably foreseeable. Excluding those amounts, Defendants Chaplin, Ratliff, and Lawrence contend that less than fifteen kilograms of cocaine are properly attributable to them, thus yielding a base offense level of thirty-two, see id. Sec. 2D1.1(c)(4), and a guideline range of 121-151 months.
 
 
 71
 At sentencing, the district court conducted a comprehensive examination of the evidence and testimony presented at trial. Based upon the evidence and testimony presented, the court determined that while the exact amount was uncertain, the record supported a finding that an excess of fifteen kilograms of cocaine were properly attributable to Chaplin. After careful review of the record, we conclude the court's finding was not clearly erroneous. United States v. Chatman, 994 F.2d 1510, 1517 (10th Cir.) ("We give due regard to the district court's opportunity to judge the credibility of witnesses on whose testimony it relied."), cert. denied, --- U.S. ----, 114 S.Ct. 230, 126 L.Ed.2d 185 (1993). Accordingly, we conclude the district court did not err in calculating the quantity of cocaine attributable to Defendants Chaplin, Ratliff, and Lawrence.
 
 2. Defendant Edwards
 
 72
 The district court attributed an amount in excess of fifteen kilograms of cocaine to Edwards in calculating a base offense level of thirty-four. See U.S.S.G. Sec. 2D1.1(c)(3) (providing for a base offense level of thirty-four for an amount of "[a]t least 15 kg but less than 50 kg of Cocaine"). In calculating this quantity, Edwards contends the district court should have excluded amounts distributed by Chaplin and those amounts distributed while he was in federal custody on unrelated charges because they were not reasonably foreseeable. We disagree.
 
 
 73
 "[A] critical factor in determining the proper sentence is the degree of any given defendant's involvement in the conspiracy." Evans, 970 F.2d at 679 (quotation omitted). Here, the district court, reviewing the evidence and testimony presented at trial, found that the quantities were reasonably foreseeable and properly attributable to Edwards because he organized and directed the distribution scheme and continued "in the endeavors [of the conspiracy] during that period of incarceration." Vol. XIV at 985. Giving due deference to the district court's factual and credibility determinations, we conclude the court's findings and calculations are not clearly erroneous, and we will not disturb them. See, e.g., United States v. Gutierrez, 48 F.3d 1134, 1139 (10th Cir.) (rejecting defendant's argument that drugs distributed were not foreseeable, in light of defendant's substantial involvement in the conspiracy), cert. denied, --- U.S. ----, 115 S.Ct. 2598, 132 L.Ed.2d 844 (1995); Banks, 10 F.3d at 1057 (same).
 
 
 74
 B. Organizer or Leader and Obstruction of Justice
 
 Enhancements
 1.
 
 75
 Defendant Edwards contends the district court erred by imposing a four-level increase in his base offense level because he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. Sec. 3B1.1(a). Edwards contends the evidence was insufficient to support the district court's finding that he was an "organizer or leader." Specifically, he contends that because he was incarcerated during a large portion of the conspiracy, he could not have been a leader or organizer. We review the district court's finding that a defendant was a leader or organizer for clear error. Robertson, 45 F.3d at 1448.
 
 
 76
 A Sec. 3B1.1(a) enhancement "is an enhancement for organizers or leaders, not for important or essential figures." United States v. Torres, 53 F.3d 1129, 1142 (10th Cir.) (quotations omitted), cert. denied, --- U.S. ----, 115 S.Ct. 2599, 132 L.Ed.2d 845 (1995). Consequently, the gravamen of a Sec. 3B1.1(a) enhancement is control or organization: " 'the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime.' " Robertson, 45 F.3d at 1448 (quoting United States v. Reid, 911 F.2d 1456, 1464 (10th Cir.1990)).
 
 
 77
 In the instant case, the evidence presented at trial overwhelmingly indicates that Edwards "exercised some degree of control over others involved in ... the offense or [was] responsible for organizing others for the purpose of carrying out the crime." Id. Edwards organized the conspiracy, set up an elaborate courier system through use of Grist's trucking company, and introduced Grist to Tavarez--the conspiracy's major source of cocaine--in order to further the overall scheme of transporting cocaine from Houston to Oklahoma. Moreover, contrary to Edwards' contentions, the evidence indicates that he exercised control over various members of the conspiracy while he was incarcerated. Consequently, we agree with the district court's observation that "there's no doubt ... that the determination that [Edwards] was a leader is established almost beyond refutation." Vol. XIV at 985. Accordingly, we hold the district court did not err in enhancing Edwards' base offense level due to his role as an organizer or leader.
 
 2.
 
 78
 Finally, Edwards contends the district court erred by enhancing his sentence by two levels for obstruction of justice pursuant to U.S.S.G. Sec. 3C1.1. This section provides for an enhancement "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." Id. We review the district court's factual determinations concerning obstruction of justice for clear error, United States v. Urbanek, 930 F.2d 1512, 1514 (10th Cir.1991), giving due deference to the district court's ability to judge the credibility of witnesses upon whose testimony it relied. Chatman, 994 F.2d at 1517.
 
 
 79
 The district court based the obstruction of justice enhancement upon testimony given by one of Edwards' codefendants in a related case, Herbert Lewis. At trial, Lewis testified that during a telephone conversation, Edwards threatened him and instructed him to say as little as possible if questioned by law enforcement agents about the cocaine distribution conspiracy:
 
 
 80
 MR. OMEILIA: During that conversation that you were having with him on the phone ... did the defendant [Edwards] talk to you about cooperating with law enforcement?
 
 
 81
 LEWIS: Well, he said--I asked him had he heard anything about me, you know, and he said, not yet but I'm pretty sure something will come up and if it comes to a point that you've got to testify, if you have to say anything about me, say the least possible because if you don't, then, remember I still got a cloud over your heard [sic] and--
 
 
 82
 MR. OMEILIA: Did you respond to that?
 
 
 83
 LEWIS: What to say? And just say as least as possible.
 
 
 84
 MR. OMEILIA: Did he tell you anything to say? He told you what not to say.
 
 
 85
 LEWIS: Basically some of the things that he told me to say was different from what I told the agents, but the great--like the end of it, the end of it was correct, but the beginning as far as how I got involved in it, it was to be all put on Mr. [J.] Grist.
 
 
 86
 MR. OMEILIA: He told you to tell the agents that?
 
 
 87
 LEWIS: Yes.
 
 
 88
 MR. OMEILIA: And did you tell the agents that?
 
 
 89
 LEWIS: Yes, I did.
 
 
 90
 MR. OMEILIA: Because you had been threatened?
 
 
 91
 LEWIS: I was scared.
 
 
 92
 MR. OMEILIA: All right. And did he tell you to say anything about anybody else?
 
 
 93
 LEWIS: Yes. If you have to put it on anybody, put it on Mr. Lawrence.
 
 
 94
 Vol. VIII at 213 (emphasis added). Edwards contends that this evidence is insufficient to support an obstruction of justice enhancement because it does not show that "Edwards tried to get Lewis to make false statements." Brief of Aplt. Edwards at 28. Consequently, Edwards contends that "[t]elling Lewis to provide as little information 'as possible' means nothing at all." Id.
 
 
 95
 Defendant's argument simply mischaracterizes the evidence presented and ignores the applicable guidelines. Contrary to Defendant's assertion, an obstruction of justice enhancement does not apply only when a defendant attempts to induce a witness to make false statements. Rather, an enhancement is warranted if the defendant "threaten[s], intimidat[es], or otherwise unlawfully influenc[es] a co-defendant, witness, or juror, directly or indirectly, or attempt[s] to do so." U.S.S.G. Sec. 3C1.1 application note 3(a). This is precisely what the district court determined occurred here. Indeed, the court stated that "there was a concerted effort being made through that telephone conversation to alter the truth, the testimony, and that there would be repercussions if that didn't occur. That's the way Mr. Lewis took it, that's the understanding I had as I heard [the testimony], and ... I would not be surprised if [the jury] interpreted it the same way." Vol. XIV at 979. Giving due regard to the district court's ability to judge the credibility of witnesses, we conclude the district court was not clearly erroneous in enhancing Defendant Edward's sentence for obstruction of justice.
 
 VIII. Conclusion
 
 96
 In conclusion, we AFFIRM the convictions and sentences imposed by the district court as to all Defendants. We DENY Defendant Chaplin's "Motion to Certify a Question of State Law." We DISMISS Defendant Lawrence's Petition for Writ of Habeas Corpus and accompanying Motion for Evidentiary Hearing.[14]
 
 
 
 *
 The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 Because Defendants raise common issues, these cases have been consolidated for purposes of appeal
 
 
 [2]
 In a prior appeal, we affirmed Tavarez' conviction for conspiracy to distribute methamphetamine and cocaine. See United States v. Tavarez, 40 F.3d 1136 (10th Cir.1994)
 
 
 [3]
 On June 2, 1993, a grand jury indicted J. Grist on various charges as a result of his participation in the instant drug operation. On September 7, 1993, J. Grist pleaded guilty to these charges. On appeal, we affirmed Grist's conviction. See United States v. Grist, No. 94-6049, 1995 WL 331242 (10th Cir. June 1, 1995) (unpublished opinion)
 
 
 [4]
 Fronting consists of a " 'credit arrangement whereby a drug buyer is given drugs in exchange for a promise to pay for them at some later date.' " United States v. Evans, 970 F.2d 663, 667 (10th Cir.1992) (quoting United States v. Mosley, 965 F.2d 906, 915 (10th Cir.1992)), cert. denied, --- U.S. ----, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993)
 
 
 [5]
 On September 11, 1995, Defendant Lawrence filed a pro se motion, styled "Request for Withdrawl [sic] of Claim of Direct Appeal of Counsel from Attorney Criag [sic] P. Bryant." In his motion, Defendant Lawrence requested that we stay his appeal so that he may convince the assistant federal public defender representing him to raise pursuant to Anders v. California, 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967) a double jeopardy and an immunity issue in this direct appeal. In a July 31, 1995 letter attached as an exhibit to Defendant's motion, public defender Bryant concluded that he would not raise the issues on appeal because the issues were not raised at the district court and did not fall within the plain error exception. Public defender Bryant, however, indicated that Defendant Lawrence could prepare a supplemental brief which Bryant would in turn seek permission to file. In an order filed September 19, 1995, we denied Defendant Lawrence's motion styled "Request for Withdrawl [sic] of Claim of Direct Appeal of Counsel from Attorney Criag [sic] P. Bryant."
 On September 25, 1995, three days before the September 28, 1995 oral arguments in this consolidated appeal, Defendant Lawrence filed a pro se supplemental brief. In his supplemental brief, Defendant Lawrence argues we should dismiss the indictment underlying his conviction in the instant case because the indictment violated the double jeopardy clause of the Fifth Amendment. Specifically, Defendant Lawrence contends that the indictment constituted double jeopardy because he was previously subjected to a civil forfeiture proceeding pursuant to 21 U.S.C. Sec. 881(a)(6). We liberally construe Defendant Lawrence's pro se brief as a motion for leave to file a supplemental brief with accompanying brief, see Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972), and grant the motion to file a supplemental brief. We note, however, that a pro se party "must follow the same rules of procedure that govern other litigants." Oklahoma Federated Gold and Numismatics, Inc. v. Blodgett, 24 F.3d 136, 139 (10th Cir.1994). Because Defendant Lawrence neither raised the double jeopardy issue in the district court nor asserted it in his opening brief, we do not address it. See United States v. Griffin, 48 F.3d 1147, 1151 n. 6 (10th Cir.) (refusing to address Eight Amendment issue raised for first time on direct appeal from a criminal conviction), cert. denied, --- U.S. ----, 115 S.Ct. 2630, 132 L.Ed.2d 870 (1995); Codner v. United States, 17 F.3d 1331, 1332 n. 2 (10th Cir.1994) (declining to consider issues not raised in the appellant's opening brief).
 
 
 [6]
 We deny Defendant Chaplin's "Motion to Certify a Question of State Law" to the Oklahoma Court of Criminal Appeals regarding the interpretation of the Oklahoma Security of Communications Act. See, e.g., Anaconda Minerals Co. v. Stoller Chem. Co., 990 F.2d 1175, 1178 (10th Cir.1993) (declining to certify a question of state law where prior panel had decided the issue)
 
 
 [7]
 Defendants strenuously contend that there was no evidence concerning the existence of any pooling arrangement or their knowledge of such arrangement. Rather, Defendants contend that the evidence merely shows that "[J.] Grist got money from various persons buying from him and used the money to buy drugs from his own upstream supplier for redistribution to the buyers downstream, including the defendants."
 We disagree with Defendants' characterization of the record. The record in the instant case is replete with instances showing Defendants' knowledge of a pooling arrangement with J. Grist. See, e.g., Aplt. Addm. Tab. 6A, p. 2 (Grist indicates to Chaplin that he cannot make a drug purchase until he obtains enough funds because "2 or 3 guys kinda got behind--an ... it ... kinda put me in a crunch."); id. Tab 10A, p. 2 (Grist indicates to Chaplin that he has been unable to make a large purchase yet because "[i]t takes a pretty good amount to get very many wheels [kilograms of cocaine]."); Vol. X at 506 (indicating Edwards' knowledge that he had contributed to a $90,000 common fund that had been confiscated by police when one of Grists' couriers was arrested).
 
 
 [8]
 The district court gave the following pertinent instructions which are virtually identical to those we approved in Evans:
 It is your duty to give separate and individual consideration to the evidence as it relates to each individual defendant. When you do so, you should analyze what the evidence in the case shows with respect to that individual defendant leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants.
 Unless otherwise stated, each defendant is entitled to have his case determined from evidence as to his own acts, statements, and conduct and any other evidence in the case which may be applicable to him.
 Mere similarity of conduct among various persons and the fact they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.
 See Vol. I, Tab 96, pp. 6, 18.
 
 
 [9]
 Defendant Lawrence concedes the district court's instructions satisfied the standards of Evans and Watson. See, e.g., Brief of Aplt. Lawrence at 19 ("These instructions appear to satisfy the standard set by this Court, in Evans and Watson."). However, Lawrence contends that we should revisit this issue and follow those circuits which have concluded that a defendant is entitled to a multiple conspiracy instruction as a theory of defense when the facts warrant such a defense. See Cavin, 39 F.3d at 1310; United States v. Oreto, 37 F.3d 739, 748 (1st Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995); United States v. Kennedy, 32 F.3d 876, 884 (4th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 939, 130 L.Ed.2d 883 (1995); United States v. Dennis, 917 F.2d 1031, 1033 (7th Cir.1990); United States v. Cambindo Valencia, 609 F.2d 603, 625 (2d Cir.1979), cert. denied, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). In Evans, we specifically rejected such an approach, see Evans, 970 F.2d at 674-75, and we must follow that decision. See Brittain, 41 F.3d at 1415
 
 
 [10]
 Defendants Lawrence and Chaplin also adopt this argument by reference in their brief
 
 
 [11]
 Defendant Lawrence appears to suggest that the district court erred in admitting the prior testimony because it failed to articulate the specific purpose for which the evidence was admitted, but instead merely restated the language of Rule 404(b). We disagree
 We have held that "a broad statement merely invoking or restating Rule 404(b) will not suffice" to identify the specific purpose for which a district court admitted Rule 404(b) evidence. United States v. Kendall, 766 F.2d 1426, 1436 (10th Cir.1985), cert. denied, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). However, even if the district court fails to specifically articulate the basis for admission, the error is harmless as long as a proper purpose is apparent from the record. United States v. Record, 873 F.2d 1363, 1373 (10th Cir.1989). As our analysis indicates, the specific purpose for admitting the prior testimony in the instant case is apparent from the record.
 
 
 [12]
 Fed.R.Evid. 404(b) provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 [13]
 In his reply brief, Defendant Edwards contends that "African-Americans comprise approximately 8.3% of the population in Tulsa County."
 
 
 [14]
 Proceeding pro se, Defendant Lawrence has filed in this court a "Petition for Writ of Habeas Corpus and Order Discharging from Custody" and an accompanying motion requesting an evidentiary hearing. Construing Defendant's motions liberally, see Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972), we view them as seeking collateral relief from his conviction pursuant to 28 U.S.C. Sec. 2255. See, e.g., United States v. Rourke, 984 F.2d 1063, 1067 (10th Cir.1993) (liberally construing a pro se motion as one brought pursuant to Sec. 2255); Ray v. United States, 295 F.2d 416, 417 (10th Cir.1961) (petition designated as petition for writ of habeas corpus and filed in original criminal action was properly treated as a Sec. 2255 motion). "Federal courts of appeals have no power to consider an original motion to set aside sentence under ... Sec. 2255." United States v. Auman, 8 F.3d 1268, 1272 (8th Cir.1993) (citing cases). Rather, "[m]otions under [Sec. 2255] must be brought in the sentencing court, preferably before the sentencing judge who is most familiar with the case." Carter v. Attorney Gen. of the United States, 782 F.2d 138, 141 (10th Cir.1986). Because we have no jurisdiction to consider Defendant's Sec. 2255 motion, we dismiss Defendant's motions without prejudice in order that he may file them in the proper forum